(C. D. 1353)

RAILWAY EXPRESS AGENCY, INC. *v.* UNITED STATES

United States Customs Court, First Division

(Decided July 27, 1951)

*Barnes, Richardson & Colburn* (*Joseph Schwartz* and *Edward N. Glad* of counsel) for the plaintiff.

*David N. Edelstein,* Assistant Attorney General (*Jerome Vale,* special attorney), for the defendant.

Before OLIVER, COLE, and MOLLISON, Judges

MOLLISON, Judge: The question at issue in this case is the meaning to be ascribed to the term "Turn or turned boots and shoes" used in the Swiss Trade Agreement, reported in T. D. 48093. The plaintiff herein imported certain baby shoes which were assessed with duty at the rate of 20 per centum ad valorem under the provision in paragraph 1530 (e) of the Tariff Act of 1930 for—

Boots, shoes, or other footwear * * * made wholly or in chief value of leather, not specially provided for * * *.

The protest claim is for duty on the merchandise at the rate of 10 per centum ad valorem under the provision of the same paragraph and subparagraph as modified by the Swiss Trade Agreement, *supra*, reading as follows:

Turn or turned boots and shoes, made wholly or in chief value of leather, not specially provided for.

At the trial of the issue the claim as to invoice item 089 was withdrawn and the protest claim limited to the other items of baby shoes assessed at the 20 per centum rate.

The method by which the shoes involved were made is not in dispute, and was described by the factory manager of the manufacturer of the shoes in question as follows: Soft pliable cowhide leather is cut by hand or by machine into uppers, soles, facings, counters, etc. The parts are then put together so that the inside of the completed shoe is on the outside, and they are sewn by machine. A sample of the shoe at this state of manufacture was received in evidence as plaintiff's illustrative exhibit A, and is best described as "inside out."

The shoe is then sent to the lasting department, where it is "mulled" or wetted, which makes the ensuing operation easier. The shoe is then turned right side out on a "pin" by hand. After this, a "filler" and a wooden last are inserted into the shoe, and various finishing operations are performed, which operations do not appear to be material here, following which the last is withdrawn.

It is the plaintiff's position that any shoe made by first sewing together the parts of the shoe, including the sole and upper, "wrong" side (i. e., inside) out, and then "turning" it, i. e., bringing the "right" side outside, is a turn or turned shoe. There seems to be no doubt that turn or turned shoes receive their name as such by reason of the fact that the shoe is first made wrong side out and later in the manufacturing process it is turned right side out, but it is the defendant's contention that other and further definitive factors must be present in a shoe, among which is a distinctive type of channeling

in the sole, before it can be said to be a turn or turned shoe. The defendant contends that such factors are not present in the shoes at bar.

The single witness called to the stand for the plaintiff, who had 15 years' experience in the factory of the manufacturer, working in every department, but apparently having no experience elsewhere, stated that the shoes in question, made by the process described above, were turned shoes. On shoes larger than baby shoes, he said, a channel was used because the leather was stiffer and heavier thread had to be used, and the purpose of the channel was to cover the thread.

For the defendant, a consulting engineer in the shoe industry was called to the stand. This witness had had 25 years' experience in the shoe industry, including 10 years as a manufacturer of "ladies' high-grade turned shoes." In his opinion, the shoes in issue were not turn or turned shoes for the reason that all such shoes have a channel in the sole to receive the thread which unites the upper to the sole.

The only question for us to decide is the meaning to be applied to the term "turn or turned boots and shoes." Apparently neither party contends that the commercial meaning of that term differs from the common meaning—at least neither party proceeded along the lines necessary in order to invoke the doctrine of commercial designation. In this situation, the testimony of both witnesses as to the meaning of the term is advisory only and is not binding on the court.

Resort to lexicographic aids in determining the common meaning of the term "turn or turned boots and shoes" indicates that as commonly understood the term refers to boots and shoes manufactured by sewing the upper and sole together wrong side out and later turning the article thus made inside out, which results in having the right side exposed. We do not find anything which would indicate that as commonly understood there is a requirement that the sole be channeled, as contended by the defendant. Thus, in Webster's New International Dictionary, second edition, 1945, the following appears under the word "turn" as a noun:

28. *Shoemaking*. A woman's fine, light, single-soled shoe or slipper made by sewing upper and sole together both wrong side out, removing the last, turning right side out, attaching the heel, and finishing.

And in volume 3, p. 888, Encyclopaedia Britannica, 1947, under the caption "Boot and Shoe Machinery" the following appears:

* * * The turned shoe is made as its name implies, wrong side out, and as it has no insole, it is very flexible. * * *

In a report to the President under the provisions of section 337 of the Tariff Act of 1930, being Report No. 31, Second Series, on Boots

and Shoes (Government Printing Office, Washington, 1932) the Tariff Commission described turn or turned shoes as follows:

Turn shoes, given that name because the upper and sole are sewed together while inside out and then turned. Such shoes are very flexible, and are made in the medium and higher price ranges.

Likewise, in the "Digests of Trade Data" concerning "Concessions Granted By the United States in the Trade Agreement with Switzerland—Washington, 1936," issued by the Tariff Commission upon the publication of the Swiss Trade Agreement, the following was said of "turn shoes":

Turn shoes are so-called because the upper and sole are sewed together while inside out and then turned. Such shoes, having no insole, are very flexible and are made in the medium and higher price ranges. This is one of the outstanding processes employed in the manufacture of high grade slippers, women's lightweight shoes, jockeys' boots and other kinds of light-weight footwear.

It may be that as used and understood in the trade and commerce of the United States the term has a special and limited significance and that other features of construction besides the "turning" feature are essential elements in the use of the term. If this were established as a fact, it would indicate the existence of a commercial meaning different from the common meaning and call for the production of evidence in accordance with the rule of commercial designation. We say this notwithstanding the statement in the brief filed on behalf of counsel for the plaintiff:

* * * To begin with, it is fundamental that commercial designation has no bearing on a case in which the phraseology employed clearly shows that the language has reference to a *process* and not to commercial designation. [Italics quoted.]

Counsel has cited no case in support of this "fundamental" principle, and it seems to us that the term in question is merely descriptive of the class of boots and shoes intended to be subjected to the rate of duty provided in the provision in which it is found. It is well settled that the rule of commercial designation applies to descriptive as well as denominative terms. *Central Warehouse Co.* v. *United States*, 12 Ct. Cust. Appls. 563, T. D. 40785, and cases therein cited.

It is the fact, however, that counsel for the defendant made no effort to establish that a difference between the common and commercial meanings of the term exists, and we have nothing before us upon which the rule might be invoked. Mention is made of the matter for the reason that counsel for the defendant seems to have been under some confusion as to the situation, as may be seen from the following colloquy:

Chief Judge Oliver: Mr. Vale, there has been no statement made by counsel in this case explaining the Government's position which I usually like to have.

Am I correct in assuming that Government's position in this case is, regardless of the fact that these baby shoes are turned or reversed, or whatever term you want to use, that it is the Government's position that they are not turned shoes within the meaning of the term in the trade and industry?

MR. VALE: Precisely, Judge. The Government contends also, that the word "turned" as used in the trade agreement is the accepted use of the word "turned" in the shoe trade.

JUDGE MOLLISON: Then there is an issue as to the commercial designation involved?

MR. SCHWARTZ: There isn't as far as the plaintiff's case is concerned and we say further so long as the Court has brought this subject up, that evidence as to commercial designation is immaterial in a case of this kind where the terminology in the Trade Agreement is not commercial terminology but a process. Turn or turned shoes is a manufacturing process. Therefore, evidence of commercial designation may not be introduced, we think, to change the meaning of that process. Congress meant a shoe that was turned and there was no question about commercial designation.

MR. VALE: May I amend the previous position that I made. The word "turned" is the commercial designation in the trade. That's all. (Tr. pp. 23–4.)

We are satisfied, and so hold, that in its common meaning the term "Turn or turned boots and shoes" refers to boots and shoes manufactured by sewing the upper and sole together wrong side out and later turning the article thus made inside out, which results in having the right side exposed. Upon the record made herein and in the absence of proof of a contrary commercial meaning of the term, we find that the shoes involved are embraced within the said common meaning of the term, and the protest claim for duty at the rate of 10 per centum ad valorem under paragraph 1530 (e) of the Tariff Act of 1930, as modified by the Swiss Trade Agreement, T. D. 48093, is sustained as to all of the items covered by the invoice which were assessed with duty at the rate of 20 per centum, except item 089.

Judgment will issue accordingly.