(C. D. 1363)

ROBINSON-WAGNER CO., INC. v. UNITED STATES

United States Customs Court, First Division

(Decided August 30, 1951)

*Eugene R. Pickrell* for the plaintiff.
*David N. Edelstein*, Assistant Attorney General (*Jerome Vale*, special attorney), for the defendant.

Before OLIVER, COLE, and MOLLISON, Judges

MOLLISON, Judge: The plaintiff herein imported two shipments of a commodity described on the invoices as "Wool Grease," one shipment consisting of 151 drums covered by entry 785139, dated March 17, 1949, and the other consisting of 148 drums covered by entry 791493, dated April 6, 1949. Paragraph 52 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, T. D. 51802, in force and effect at the time of importation, makes provision, at different rates, for three kinds or classes of wool grease, as follows:

· Wool grease:

Containing more than 2 per centum of free fatty acids_____ ½¢ per lb.

Containing 2 per centum or less of free fatty acids and not suit-
able for medicinal use_____ 1¢ per lb.

Suitable for medicinal use, including adeps lanae, hydrous or
anhydrous_____ 2¢ per lb.

The wool grease here involved was assessed with duty at the rate of 2 cents per pound under the foregoing provisions. A further assessment of tax or duty was made at the rate of 3 cents per pound under the provisions of section 2491 (a) of the Internal Revenue Code, as amended, *supra*, but no claim was made as to the last-mentioned assessment, the protest being directed against the assessment of duty at the rate of 2 cents per pound under paragraph 52 of the Tariff Act of 1930. The grounds of the protest, as recited therein, are—

\* \* \* that said merchandise is neither woolgrease suitable for medicinal use, nor adeps lanae, hydrous or anhydrous, but is properly classifiable as woolgrease containing 2 percent or less of free fatty acids and not suitable for medicinal use under paragraph 52 of the Tariff Act of 1930, as amended by the Reciprocal Trade Agreements, published as T. D. 51802, at 1 cent per pound.

It would appear from the use of the term "including adeps lanae" in the language used in the tariff designation under which classification and assessment of duties were made, viz, "Wool grease: \* \* \* Suitable for medicinal use, including adeps lanae, hydrous or anhydrous," that wool grease other than adeps lanae is suitable for medicinal use. However, the case was tried by both parties upon the issue of whether the imported material met the requirements of the United States Pharmacopoeia for adeps lanae, and the gist of much of the evidence offered by the plaintiff is that only wool grease which meets the requirements of the United States Pharmacopoeia is suitable for medicinal use. This evidence was not rebutted by the defendant, and, in fact, appears to be consistent with the evidence offered on behalf of the defendant.

Each party bases its case upon analyses made by qualified chemists of samples of the imported material. The analyses made by plaintiff's chemists show the material to be wool grease which does not meet the requirements of the United States Pharmacopoeia for adeps lanae but which contains less than 2 per centum of free fatty acids. The analyses made by defendant's chemists show the material to be wool grease conforming to the requirements of the United States Pharmacopoeia for adeps lanae. We are satisfied from the record that the chemists who made the respective analyses were equally qualified to perform the task of analyzing the sample presented to them, so that determination of the matter, in fine, rests upon the

character as representative of the imported material of the samples upon which the analyses were made.

The history of the sampling of the merchandise involved as shown by the record is as follows: Entry 791493 covered 148 drums of wool grease numbered from 152 to 299. While the drums were on the wharf and prior to delivery to the plaintiff, Customs Inspector Hughson Hawley extracted a sample with the use of a trier from each of drums Nos. 160, 212, and 287. In the words of the inspector who was called as a witness on behalf of the defendant, a trier is described as follows:

It is a steel shaft or tube * * *. About three feet, three inches [long] * * * which has been cut longitudinally so it has an open face with a "T" shape handle attached, with a bevelled point. (Tr. p. 103.)

The use of the trier was described by Mr. Hawley as follows:

* * * We open the bung on the drum and insert this [trier] as deeply as we can, always at least half the length of this if the stuff was hard, but if very soft, we take it the entire way. We turn it in the drum; insert it diagonally so the prong in most cases is opposite the bung, is not in the center of the drum but over near the chime; from one chime diagonally across to the other chime and then when we remove it, it contains a core of wool grease which we push off the stick into the can and each sample from each drum is kept in a separate can and numbered according to the drum from which it is taken. (Tr. p. 102.)

It appeared that the cans were new cans, and that each was equipped with a friction-type cover, and after taking the sample in each case, he wrote the number on the lid, put the samples from each importation into a bag with the importation number marked thereon and the Elliott-Fisher tickets concerning the entry, and sent the bag to the sample office for his district, from whence it was sent through official channels to the examiner of merchandise.

It also appeared that the selection of the drums to be sampled was left to the witness and that he made his selection as follows:

Out of the range of numbers; with 150 numbers you have three sets of fifty and somewhere in each set of fifty I selected a number and that was this. (Tr. p. 107.)

The witness stated that the drums were from 30 to 34 inches in depth and that he inserted the trier a minimum of 2 feet in each one, although he may have gone to the bottom of each drum. He identified three cans as the cans he used in connection with the sampling of the merchandise covered by entry 791493, and they were received in evidence over the objection of counsel for the plaintiff as exhibits 12–A, 12–B, and 12–C.

The witness then testified that with respect to entry 785139, covering 151 drums of wool grease numbered 1 to 151, he took samples from drums Nos. 17, 67, and 112, and followed the same procedure as in the previous case, except that he was more certain that the trier went to the bottom of the drums. These samples, identified by the witness,

were received in evidence over the objection of counsel for the plaintiff as exhibits 13–A, 13–B, and 13–C.

The sampling on behalf of the plaintiff was done under the supervision of plaintiff's witness, John C. Robinson, a chemist and production manager of the plaintiff corporation, one of whose duties was to check on raw materials which were purchased. According to the witness, an unstated number of samples was first drawn from approximately 10 percent of 76 of the 151 drums covered by entry 785139. These were melted together to form what was described by the witness as a "preliminary composite sample." From the findings on the preliminary sample, it was found necessary, the witness said, "to compile a completely composite sample; it was questionable." Although the records of such findings were preserved, according to the witness, they were not offered at the trial and the preliminary sample was destroyed.

Thereafter, each of the two importations was divided into two batches of approximately 75 drums in each batch. The material from the 75 drums in each batch was pumped into a large processing tank in which it was heated and agitated thoroughly "in order to obtain a uniform mixture" and a sample was drawn from each batch of the mixed material. Four samples identified by the witness as having been thus obtained from each of the four batches were received in evidence over the objection of counsel for the defendant as plaintiff's collective exhibit 1.

It is at once apparent that the basic conflict here is between two methods of sampling and what they represent. On the one hand are the four composite samples of collective exhibit 1 which were described by plaintiff's witness as representing "a true average chemical composite of the entire shipment." On the other hand are the six individual samples withdrawn from six individual drums, each of which actually represents only the contents of the drum from which it was withdrawn. In making this latter statement, we are not unmindful of the fact that by the examination procedure sanctioned by the law, to wit, section 499 of the Tariff Act of 1930 and the appropriate customs and special regulations issued thereunder (including T. D. 49412, relating to animal greases), permitting the examination of a less number of packages than 1 package of every 10 packages covered by each invoice, the said 6 individual samples represent the character for the purposes of the collector's classification of the contents of all the other drums in the shipment. We are here concerned with the strictly evidentiary aspect of the six samples, as will be seen from what here follows.

The "composite" method of sampling is obviously subject to the criticism that if any of the drums contained an inferior product while the remainder of the drums contained a superior product, the compos-

ite, representing an average, would be of lesser quality than the contents of the drums constituting the superior portion of the shipment. Although it was stoutly denied by the plaintiff's witness Robinson that such was the case in the matter before us, it was admitted that the composite picture could be affected by the inclusion therein of a small amount of crude wool grease.  (Tr. p. 15.)

On the other hand, the individual drum-sampling technique is subject to the criticism, as pointed out by witnesses for the plaintiff, that in each drum there is a variation between the top and bottom, the heavier material tending to go to the top and the lighter to the bottom. An interesting point in this connection, but one which was not developed in the record, is whether, if the trier in sampling a drum did not go all the way to the bottom, a better-than-average quality sample would be obtained, or a poorer-than-average quality sample would be obtained.

It will be seen that while the method used by the plaintiff gives a truer picture of the shipment as a whole, it does not indicate whether any of the individual drums might have contained better-than-average-of-the-shipment wool grease.  It is, however, not inconsistent with such being the case, and to that extent does not refute the evidence offered by the defendant that at least six drums of the entire shipment contained wool grease suitable for medicinal use.

It is this latter situation which we think must govern the disposition of this matter.  If, in fact, any of the drums contained wool grease suitable for medicinal use—and, as we have just said, the evidence offered on behalf of the defendant indicates that at least six of the drums did contain that material upon importation, and such evidence is not controverted—then the situation was that some of the drums contained wool grease classifiable at the highest rate provided in paragraph 52 while the remainder of the drums may or may not have contained wool grease of such character.

It seems to us that the provision of law which thereupon becomes applicable is that contained in section 508 of the Tariff Act of 1930 (19 U. S. C. § 1508), which reads as follows:

SEC. 508.  COMMINGLING OF GOODS.

Whenever dutiable merchandise and merchandise which is free of duty or merchandise subject to different rates of duty are so packed together or mingled that the quantity or value of each class of such merchandise can not be readily ascertained by the customs officers, the whole of such merchandise shall be subject to the highest rate of duty applicable to any part thereof, unless the importer or consignee shall segregate such merchandise at his own risk and expense under customs supervision within ten days after entry thereof, in order that the quantity and value of each part or class thereof may be ascertained.

While it may well have been true, as is indicated by the evidence offered on behalf of the plaintiff, that the *average* quality of the entire shipment was that of wool grease not suitable for medicinal use,

nevertheless, if the merchandise was (1) so packed that there were contained in the shipment two or more classes of merchandise bearing different rates of duty, and (2) the quantity of each class could not be readily ascertained by the customs officers, then, in the absence of segregation by the importer or consignee under the foregoing statute, the entire quantity of merchandise would be chargeable with the highest rate of duty applicable to any part thereof. The conditions upon which the statute becomes operative were met in the case of the shipments of wool grease at bar in that at least six of the drums contained wool grease suitable for medicinal use and dutiable at the highest rate applicable to wool grease, and it is apparent that since the question of whether any given drum contained one class or another of wool grease could only be determined by analysis thereof, the customs officers could not readily ascertain the number of drums containing each class of wool grease.

We are not unmindful of the fact that the plaintiff may have ordered and expected to receive wool grease not suitable for medicinal use, and that the average of the entire shipment actually was just such wool grease. The fact is, however, that the shipment was packed in drums, and the evidence establishes that some of the drums contained wool grease of the highest class. The policy of the law in such cases is indicated by section 508, *supra*, and is to assess duty, not upon the average of the classes of merchandise in a shipment, but upon the highest class thereof if the classes involved can be segregated and the segregation is not done.

For the foregoing reasons the protest claim must be overruled, and judgment will issue accordingly.