**DANIEL GREEN SHOE CO.**

v.

**UNITED STATES (Trans World Shoe Corp., Party in Interest).**

**C.D. 2868; Protest 65/3288.**

United States Custom Court
First Division.
Jan. 12, 1967.

Collier & Shannon, Washington, D. C. (Thomas F. Shannon and Robert H. S. French, Washington, D. C., of counsel), for plaintiff.

Barefoot Sanders, Asst. Atty. Gen. (Bernard J. Babb, Trial Atty., New York City), for defendant.

John D. Rode, New York City (Ellsworth F. Qualey, New York City, of counsel), for party in interest.

Brooks & Brooks, New York City (J. Joseph McDermott, New York City, of counsel), amicus curiae.

Before OLIVER and RICHARDSON, Judges, and WILSON, Senior Judge.

RICHARDSON, Judge:

This action involves an American manufacturer's protest filed pursuant to 19 U.S.C.A. section 1516 (section 516, Tariff Act of 1930) contesting the classification of certain footwear as "turn or turned footwear" under item 700.20 of the Tariff Schedules of the United States, with duty assessed thereon at the rate of 5 per centum ad valorem. The imported merchandise is described on the invoice as "Mens * * * Aniline Jesters" and "Mens * * * Aniline Mules" and consists of men's house slippers. It was stipulated that Consumption Entry 831017 pertaining to the imported merchandise was liquidated on January 5, 1965; and that a sample, having been examined by the parties, consists of men's footwear in which the upper and sole were stitched together inside out whereupon it was turned to a right side out position, and that the outer sole has no channel to house the stitches.

The tariff provision under which classification was made, reads as follows:

Footwear, of leather (except footwear with uppers of fibers):

\*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*

Turn or turned footwear . . . . . . 5% ad val.

———◆———

Plaintiff claims that duty should be assessed at the rate of 10 per centum ad valorem pursuant to item 700.35 of the Tariff Schedules of the United States providing for "Footwear, of leather (except footwear with uppers of fibers): * * * Other: For men, youths, and boys."

It was stipulated that the imported merchandise should be assessed for duty pursuant to plaintiff's claim in the event the collector's classification was determined to be erroneous.

The statutory prerequisites necessary to commence an American manufacturer's protest having been met, the sole issue presented herein is the meaning to be given to the tariff term "turn or turned footwear." It is plaintiff's contention that this term has a commercial designation in the trade and commerce throughout the United States different from its common meaning. Pursuant thereto, plaintiff introduced the testimony of five witnesses to establish the proposition that the imported merchandise lacks certain essential requirements for commercial designation as "turn or turned footwear."

Plaintiff's first witness, Warren J. Reardon, president of the Daniel Green Shoe Co., testified that he has been in the shoe business for 56 years, as of the time of trial, and has been associated with the plaintiff for the last 52 years. He has traveled and sold to the retail trade, is a member of the National Footwear Manufacturers Association and a director of long standing on its Technical Shoe Manufacturing Committee. Mr. Reardon stated that he has made turn or turned shoes and soft sole shoes, as well as slip lasted shoes, and that his organization manufactures two types of shoes—soft soled house slippers and cement constructed house slippers. The witness further stated that his company produces

soft sole shoes similar to the imported merchandise.

Mr. Reardon identified plaintiff's exhibit 1, stipulated to be a representative sample of the imported merchandise in issue, as a soft sole house slipper. He thereupon described in some detail the manufacturing process necessary to construct exhibit 1, pointing out that the " * * * upper and the sole are stitched together wrong side out, without a channel * * *, " whereupon a cushion and sock lining are attached. It is then moisturized (mulled), turned right side out, and fitted over a last and finished. When asked whether exhibit 1 is a turn or turned shoe as commercially understood, the witness replied that it was not to his knowledge a turned shoe " * * * because a turned shoe, as we understand it in the industry, is one whereby the outer sole has an inside channel to which the upper is stitched inside out."

When shown plaintiff's exhibit 2 (an imported hard soled house slipper unrelated to the merchandise at bar), Mr Reardon identified it as " * * * a genuine turned shoe," as technically understood, having " * * * an outer sole containing an inside channel, to which [an] upper is stitched * * * wrong side up while on the last." The witness clarified what he felt are the main characteristics of a turn or turned shoe in stating that a "Turned shoe is one that has an outer sole with an inside channel, to which the upper is stitched while wrong side out *on the last*." [emphasis added]. On cross-examination it was further brought out that after being stitched together inside out, it is removed from the last and turned right side out whereupon it is reinserted back on the last to be finished.

Plaintiff's exhibit 3, a soft soled house slipper, was identified by the witness as a manufacture of his company. Its construction is similar to that of plaintiff's exhibit 1. The witness testified that according to technical usage it could not be termed a turned shoe as it lacks a channel. However, when repeatedly queried, he consistently stated that exhibit 3 was sewn inside out while *on the last*. On cross-examination he indicated that a major advantage of a turned shoe is the flexibility of its sole and that the principal aspect of a turned shoe is not the turning, but " * * * an outer sole with an inside channel to which the upper is stitched to while inside out on the last."

Lastly, Mr. Reardon identified party in interest's exhibit A, a hard sole slipper, as a turned shoe as there appeared to be a channel.

Plaintiff's second witness, Roland Franzen, a manufacturer of shoes, had produced turned shoes from 1932 until 1965. His definition of a turned shoe was similar to that set forth by Mr. Reardon. The witness identified plaintiff's exhibits 4–A through 4–F as exhibits illustrating the necessary stages in the construction of a turned shoe. Exhibits 4–A and 4–B are channeled leather soles (exhibit 4–B containing stitches within the channel to demonstrate the channeling effect), useful only in the manufacture of turned shoes. Both an upper, exhibit 4–C, and sole are placed inside out upon a last and stitched together, exhibit 4–D, whereupon it is removed from the last in its inside out condition and turned right side out, exhibit 4–E. The shoe is subsequently reinserted over a smaller last and relasted, exhibit 4–F, and finished. Exhibits 4–A through 4–F, when completed, are sold as turned shoes.

Mr. Franzen identified plaintiff's exhibit 1 as a soft soled shoe. It would not be considered a turned shoe even though turned during its construction, due to the absence of a channel. The upper and sole cannot be combined while on the last because the machinery involved is not designed for that kind of operation. Plaintiff's exhibit 2 was identified by Mr. Franzen as a turned shoe as it is characterized by a channel on the foot side of a hard sole through which the upper and sole are stitched together.

Plaintiff's third witness, James Chandler, testified that he is the manager of

the production equipment department, involving product development and selling, of the United Shoe Machinery Corp., a large manufacturer of shoemaking machinery. He has been with this organization since 1937, and before that having had experience in the production of turnshoes. Mr. Chandler identified plaintiff's exhibit 1 as a soft soled slipper, and plaintiff's exhibit 2 as a turned shoe. He said exhibit 2 has a single leather heavy sole housing a channel to which the upper is stitched, and exhibit 1 has a soft sole to which the upper has been stitched. Mr. Chandler further testified that the channels in plaintiff's exhibits 4–A and 4–B are used as a stitching guide in the construction of turned shoes, although it could conceivably be used in a Goodyear welt insole. However, there are technical differences between shoes of a Goodyear welt construction and a turned shoe construction, and before a sole as represented by either plaintiff's exhibits 4–A or 4–B could be used in a Goodyear welt, certain technical modifications would be necessary.

Mr. Chandler identified plaintiff's exhibits 5–A and 5–B as pamphlets prepared by the United Shoe Machinery Co. The pamphlets contain text material on the construction of turned footwear and represent not only the witness' views, but what Mr. Chandler understands to be the views in the trade.

Harold B. Gessner, president of Oomphies, Inc., a sales company for LaMarquise Footwear, Inc., manufacturers and importers of various kinds of footwear, testified as plaintiff's fourth witness. The witness has been in the shoe business since March 1942. He is primarily concerned with sales and represents that he has a large clientele throughout all 50 states.

Mr. Gessner identified plaintiff's exhibit 1 as a men's soft soled slipper. Plaintiff's exhibit 2 was identified as a turned slipper as it has a hard sole with a channel on the inside. Based upon his sales experience, particularly as derived from his participation in the National Shoe Fair, he stated that exhibit 2 has never to his knowledge been known as anything other than turned footwear, and that exhibit 1 has similarly never been referred to as anything other than a soft soled shoe.

On cross-examination, Mr. Gessner freely admitted that he never presently or in the past sold turned footwear at wholesale, although he had some experience in the retail field. He stated that he has, however, seen turned footwear manufactured in Switzerland.

Plaintiff's final witness was Jacob I. Suttin, vice president and merchandise manager of the Coward Shoe Co., retailers of men's, women's and children's shoes, having stores in the New York City area, Boston, and Baltimore. Mr. Suttin has been associated with the Coward Shoe Co. since 1930, when he started as an assistant buyer, becoming a buyer, and finally moving into merchandising. He has also had experience selling shoes at retail. Mr. Suttin identified plaintiff's exhibit 1 as a soft soled slipper by which it has been known since before 1930. Having familiarity with soft sole manufacturing techniques, the witness agreed that at some point in its manufacture exhibit 1 had been turned, but contended that this would not signify it as a turned slipper. He further testified that he did not know anyone in the trade who would designate exhibit 1 a turned slipper.

When shown plaintiff's exhibit 2, he identified it as a turned shoe in its construction, having been known as such since 1930, although by style it would be known as a slipper. He expressed his familiarity with the construction of turned shoes, having observed their manufacture. He considered it to be a turned shoe by the presence of a channel in the sole, the channel being necessary to guide the stitching connecting the upper and sole.

In support of their contention that a distinct commercial designation does not exist, the defendant and party in interest introduced the testimony of four witnesses representing the views of both litigants.

Mr. Henri Bendel, president and owner of Belgian Shoes, Inc., retailers and distributors of shoes and casuals, having offices in New York City and other locations throughout the United States, testified as to his understanding of turned footwear. As president, he is charged with the buying of shoes, their advertising and promotion. Sales are in all 50 states and the free world. The witness has had experience with turned shoes for approximately 30 years. He identified defendant's collective exhibit B as photographs illustrating the manufacturing process the witness has observed in the construction of soft soled turned casuals. The photographs show an upper and sole being stitched together inside out whereupon a soft filler and sock lining are sewn in place after which the shoe is hand turned. Samples of the finished products portrayed in the aforementioned photographs were received in evidence as defendant's collective exhibit C. Mr. Bendel emphasized that to his knowledge these casuals have no channel, and are not put on the last until after they are turned, but are, however, known as turned footwear and have been advertised and sold as such. Pursuant thereto, various advertisements which have appeared in various national and local publications were received in evidence as defendant's collective exhibit D. Thereafter defendant's exhibit E, identified by the witness as a collection of his advertisements appearing in the New Yorker magazine over a period of 9 years commencing in April of 1956, was also received in evidence.

Mr. Bendel's understanding of turned footwear " * * * is any shoe constructed primarily inside out, regardless of its construction, whether by machine or by hand, or any other manner, but when it is primarily made inside out, it is turned." He felt this was also the opinion of the general public.

The witness stated that he was not a manufacturer and was not familiar with technical considerations in the manufacture of shoes, and never had experience in the utilization of a channel or in the manufacture of turned shoes. He imports large quantities of soft soled shoes which he also calls a turned shoe, and is familiar, however, with their construction. He does not import turned shoes with a channel, nor buy them domestically. Having identified plaintiff's exhibit 1 on direct examination as a turned shoe, Mr. Bendel distinguished plaintiff's exhibit 2 by its channelled sole. This did not, however, change his views as to what is a turned shoe.

Mr. Nathan Stix, chairman of the board of the United States Shoe Corp. a large shoe manufacturing concern, testified that his corporation produces women's and children's shoes, and sells to retail and department stores in all 50 states. Qualified by his long experience in footwear construction and being familiar with the manufacture of turned footwear, the witness stated that the trade understanding of turned footwear is "a shoe that is stitched inside out, and then turned." Whether or not a channel is present in footwear is immaterial, the criterion being "whether it is turned inside out in the manufacture." When shown plaintiff's exhibit 1, he declined to state whether it was a turned shoe because he could not tell from looking at it how it had been stitched. However, on cross-examination, he differentiated exhibit 1 from plaintiff's exhibit 2 in that exhibit 1 has no channel, while exhibit 2 does. He added " * * * [the] end result may be the same." If ordering either exhibit 1 or exhibit 2, he would ask for a soft or hard sole house slipper, and would not order them by construction.

J. Jay Jaffee, president of J. & B. Shoe, Inc., retailers of women's shoes, and member of the board of L. L. Berger & Co., retailers of women's and children's shoes and slippers, gave similar testimony with reference to the trade understanding of turned footwear. Based upon long experience in retailing and his familiarity with turned footwear he stated that turned footwear as understood in the trade is "any shoe that is sewn inside out, and

then turned and finished." There is no requirement that turned footwear be turned while on the last nor that it have a channel in the sole. The channel fabrication is just one type of turn construction.

Mr. Jaffee identified plaintiff's exhibit 1 and one of the shoes in defendant's collective exhibit C as turned footwear, as they were stitched together inside out. He also identified plaintiff's exhibit 2 as turned footwear, indicating that it also has a channel. It was emphasized that the witness usually bought at wholesale.

Mr. Arnold Dunn, executive vice president of the Marx & Newman Co., importers of women's shoes, was the last witness to appear. He testified that apart from his various administrative tasks, he designs shoes. Having had experience in various aspects of the footwear industry, including the designing and selling at wholesale and retail of turned footwear, he stated that the trade understanding of turned footwear is "footwear which has been manufactured sewn inside out and then turned. It may further be identified by the absence of a functional inner sole to which the upper is attached." There is no requirement that turned footwear have a channel in the sole. When shown plaintiff's exhibits 1 and 2 and one of the shoes in defendant's collective exhibit C, he identified them as turned footwear. He distinguished plaintiff's exhibit 1 from exhibit 2, stating that exhibit 1 is a soft sole slipper and that exhibit 2 is a hard sole slipper with a channel. He would order exhibits 1 and 2 as slippers, and would not specify the channel unless specifically desiring it, as there would not be any reason for doing so.

At the conclusion of the trial, plaintiff's exhibit 6, consisting of various documents and papers required by 19 U.S.C.A., section 1516, was received in evidence.

■■ Proof of commercial designation of imported merchandise is a question of fact to be established in each case. Also, before the rule of commercial designation can be invoked, the statutory language involved must be susceptible of commercial designation consideration. The case of I. Shalom & Co., Inc. v. United States, 22 CCPA 85, 87, T.D. 47067, sets forth this proposition in the following language— " * * * proof of commercial designation does not control the classification of an article if Congress, in enacting the statute, has made it manifest that the words of the statute must be understood according to their common meaning." Also see Del Gaizo Distributing Corp. et al. v. United States, 24 CCPA 64, 69, T.D. 48376. Congress has made no such manifestation in the case at bar.

■ The rule of commercial designation is further premised upon a consideration of the fact that " * * * while traiff statutes are drafted in the language of trade and commerce, nevertheless, in the absence of evidence to the contrary, the commercial meaning of a tariff term is presumed to be the same as its common meaning." United States v. M. J. Brandenstein & Co., 17 CCPA 480, 485, T.D. 43941. Also see Hummel Chemical Co. v. United States, 29 CCPA 178, 183, C.A.D. 189. To establish the commercial designation of an article, it must be shown that the article has a designation which differs from the common meaning and that the alleged commercial designation is general, definite and uniform, and not partial, local or personal, throughout the wholesale trade at or prior to the enactment of the involved statute. Nylos Trading Company v. United States, 37 CCPA 71, 73, C.A.D. 422; Passaic Worsted Co. et al. v. United States, 17 CCPA 459, 461, 462, T.D. 43916; United States v. Georgia Pulp and Paper Manufacturing Co., 3 Ct.Cust.Appls. 410, 414, T.D. 32998; Ashear Bros., Inc. v. United States, 55 Cust.Ct. 238, 241, C.D. 2582. Furthermore, the burden of proof is on the party claiming commercial designation to establish its claim by a preponderance of the evidence, United States v. M. J. Brandenstein, supra, page 485, through

" * * * persons engaged in buying and selling the merchandise at wholesale in the United States, or by persons who know, by their own experience or of their own knowledge, the meaning of the designation applied to the merchandise by those who buy and sell it at wholesale." Rice Millers' Association, American Manufacturers v. United States and Oberle (Inc.), 15 Ct.Cust.Appls. 355, 360, T.D. 42560.

■ The wide degree of conflict in the evidence of the witnesses for the respective parties negates a general, uniform and definite trade meaning to the term "turn or turned footwear." United States v. New York Cordage Co., 18 CCPA 23, 24, T.D. 43977; Downing v. United States, 1 Ct.Cust.Appls. 500, 502, 504, T.D. 31530; Kraft Phenix Cheese Corp. v. United States, 10 Cust.Ct. 271, 277–279. Furthermore, since both sets of witnesses include persons whose credentials qualify them in the respects mentioned in the *Rice Millers'* case supra, the lack of uniformity as to the trade meaning to be ascribed to the tariff term in issue, is thereby heightened.

The tariff history behind the term "turn or turned footwear" does not alter our conclusion. Originally a proposed definition of this term was included in the headnotes of the Tariff Schedules of the United States as follows:

2. For purposes of this subpart—

(d) the term "turn or turned footwear" (Item 700.20) means footwear in which the sole and upper are sewed together while inside out on the last; Tariff Classification Study, 1960, schedule 7, part 1, subpart A, headnote 2(d), page 2.

This definition was subsequently deleted * * * because of current confusion as to the scope of this term. The issue has been pending in the Bureau of Customs but has not been resolved.

The best information available to the Commission indicates that the real turned shoe is a single sole shoe of special construction the sole of which is attached to the upper by means of hidden stitching buried within the sole. The designation turn or turned applied to this shoe is believed to be merely a shorthand characterization attributable to the "turning" operations invariably involved because of the practical necessity of accomplishing the special stitching while the shoe is turned inside out. It is the type of construction, however, not the incidental turning operation that is the distinctive characteristic of this shoe. * * * Fifth Supplemental Report, Tariff Classification Study, 1963, page 46.

■ Inasmuch as the Congress was undoubtedly aware of the deletion of the proposed definition of turned footwear from the Tariff Schedules of the United States, it must be concluded that until adequately established by a preponderance of the evidence, the meaning of the tariff term in issue is its common meaning as elaborated upon in the case of Railway Express Agency, Inc. v. United States, 27 Cust.Ct. 91, C.D. 1353, and supported by the evidence adduced from the defending witnesses in the case at bar. There being a wide degree of conflict in the evidence of the witnesses from the footwear industry and thus a failure of the required proof by the plaintiff, herein, we conclude that the imported merchandise though lacking the features claimed necessary by plaintiff, was properly classified as "turn or turned footwear" pursuant to item 700.20 of the Tariff Schedules of the United States.

The protest is overruled. Judgment will be entered accordingly.

OLIVER and WILSON, Judges, concur.