(C.D. 4835)

THE FLORSHEIM SHOE CO., DIVISION OF INTERCO, INC., PLAINTIFF *v.* UNITED STATES, DEFENDANT

Court No. 76-1-00138

(Decided Jan. 2, 1980)

*Barnes, Richardson & Colburn* (*Robert E. Burke* and *Steven P. Sonnenberg* at the trial; *Thomas D. Terpstra* with them on the briefs) for the plaintiff.

*Alice Daniel,* Assistant Attorney General; *Joseph I. Liebman,* Attorney in Charge, Field Office for Customs Litigation (*Madeline B. Kuflik* at the trial and on the brief), for the defendant.

FORD, Judge: Plaintiff in this action is seeking to recover a portion of the duties paid on certain finished leather imported from France.

(1)

The merchandise was classified as calf or kip leather under item 121.30, Tariff Schedules of the United States, as modified by T.D. 68–9, which provides for duty at the rate of 9 per centum ad valorem.

Plaintiff contends the leather is not calf or kip and consequently is subject to classification under item 121.57, Tariff Schedules of the United States, as modified by T.D. 68–9, which provides for duty at 5 per centum ad valorem.

The pertinent statutory provisions read as follows:

Leather, in the rough, partly finished, or finished:

```
        *       *       *       *       *       *       *
        Other:
            Calf and kip:
121.30          Upper_____ 9% ad val.
        *       *       *       *       *       *       *
        Other:
            Not Fancy:
        *       *       *       *       *       *       *
121. 57             Other_____ 5% ad val.
```

The record consists of the testimony of four witnesses called on behalf of plaintiff. Mr. Harry Hunt, in charge of the hides and skins department of Nick Bucher & Sons Co. of Chicago, has been in the business of curing hides since 1938. William Cartmill, executive vice president of the National Tanning & Trading Co. of Peabody, Mass., whose experience in the tanning industry started in 1955 when he was with A. C. Lawrence Leather Co., where he was a raw stock buyer. Mr. Joseph A. Bistany, vice president, raw material procurement, of the Florsheim Shoe Co., has been associated with that company for over 5 years. His duties include purchasing of leather. Prior to his present employment, he was vice president, operations, of Barrett & Co , a calfskin tanner in Newark, N.J. Dr. Harland H. Young was employed by Swift & Co. in Chicago from 1932 to 1970. During this period of time he did research for the company which included curing of hides. Since 1970 he has done consulting work. The witness was active in the development of the brine-curing process.

Three witnesses were called on behalf of defendant. Mr. Vlastimil J. Surak, who for the past 25 years has been in the business of tanning in Chicago, has worked in the tanning industry in the United States and Czechoslovakia for a total of 38 years. Mr. Gustav Geisel, who is self-employed dealing in hides and skins in Chicago, has been in this field for 41 years. Mr. Milton Bailey is a civilian employed by the U.S. Navy since 1952 as a physical scientist. His duties include the development of standards relating to leather footwear for the U.S. Navy. Prior to his employment by the U.S. Navy, Mr. Bailey taught

leather technology at the College of the City of New York and from 1946 to 1952 he was employed in a tannery.

Ten exhibits were received in evidence on behalf of plaintiff and 10 exhibits for defendant as well as the record in *Florsheim Shoe Company, Division of Interco, Inc.* v. *United States*, 71 Cust. Ct. 187, C.D. 4495 (1973). The official papers were also received in evidence without being marked. The court reserved ruling on defendant's exhibit H for identification. This exhibit will be received in evidence as defendant's exhibit H as an admission against interest.

At the outset of the trial, plaintiff abandoned all entries covered by the complaint except entries 219477 and 222905. Accordingly, claims as to all entries except the above having been abandoned are dismissed.

The record establishes the production of leather requires two separate processes, to wit: Curing and tanning. According to the witnesses involved in curing, most hides are bought on a New York-trim basis. The items are then put in various packs with granulated salt or brine and remain in such condition for 30 days. The salt is used to preserve the hide by making it bacteriologically stable which prevents putrification. Moisture is drawn out by the salt which causes a weight loss of the hide of approximately 11 percent to 14 percent. Plaintiff's exhibit 2, a cured hide, weighed approximately 26 pounds before curing. After curing, it weighed 22½ pounds which weight the Government has agreed to be the weight of exhibit 2. This exhibit was withdrawn and illustrative exhibit 3, a photograph of exhibit 2, was received in evidence. A green hide or a wet hide are used synonymously and refer to an uncured hide. A cured hide is one that is biologically stable and which is ready for shipment or storage. The term "green salted" applies to the pack or pit curing, using salt on green hides without washing or fleshing.

Counsel have agreed that exhibit 4 is representative of the imported merchandise. The exhibit consists of a full skin which has been tanned. Exhibit 5 is representative of the product described on the invoices as black box. Exhibits 6 and 7 represent merchandise known as smooth calf. Each piece of leather is marked with the size by the tanner which permits the purchaser to determine whether he has received the amount of leather ordered. The sizes stamped on exhibits 4, 5, 6, and 7 are 20¼ square feet, 22½ square feet, 20½ square feet, and 22½ square feet, respectively.

Photocopies of the adding machine tapes contained in exhibits 8 and 9 are copies of the tapes supplied by the tanner. Each bundle or pallet of skins has the tape attached to the top skin and represents the amount of square feet contained in the bundle or pallet.

The consensus of opinion with respect to the square footage of a 25-pound skin is that it would amount to less than 20 square feet. Cured

hides are sold by the pound and finished or tanned leather is sold by the square foot. Yield is the amount of square feet of finished leather obtained from a cured hide. The testimony in respect to yield is contradictory since each tanner has his own process which may yield more or less square feet per hide.

Tanning was described by plaintiff's witness, Cartmill, as requiring soaking which in effect places the material back in the green state. A depilatory or hair remover is utilized to remove the hair from the skin. It is then baked, pickled, and tanned. After tanning, it is wrung out on a machine to eliminate some of the moisture. It is next shaved on the flesh side and is graded and colored. The material is subsequently dried by one of three methods. After drying, it is stacked to soften it into a more natural pliable form for finishing. The witness indicated that finishing a piece of leather is like finishing a piece of fine wood. The tanner might use one, two, three, or four coats. It is glazed by utilizing heat and friction to polish the skin. After completion of this process, it is trimmed and graded and packed for shipment.

The basic issue presented for determination is the cutoff point in weight of the hides and the square footage of the finished leather. Plaintiff contends the weight of 25 pounds or less is the recognized point as judicially determined in *Josaf Haberman* v. *United States*, T.D. 18739, G.A. 4052 (1897) and *Jos. Hecht & Sons* v. *United States*, T.D. 19716, G.A. 4215 (1898). In the latter case, the findings of fact were as follows:

(1) That the goods were all imported under the present tariff act of 1897, being assessed for duty under paragraph 437 of said act as "hides of cattle."
(2) That the raw skins all weigh less than 25 pounds each, and are in fact raw calfskins, and were so commercially known in the trade of this country on and before July 24, 1897.
(3) That the dry skins all weigh less than 12 pounds each.
(4) That commercially the dividing line between raw cowhides and calfskins, in *weight*, is 25 pounds, the term "calfskins" including all so-called hides or skins which weigh less than 25 pounds. When *dry*, the dividing line is 12 pounds, all weighing *less* than 12 pounds being commercially known as skins, and all weighing 12 pounds or over as hides.

It is noted in the decision of the *Hecht* case that "[s]uch distinction has been recognized in the tariff legislation of Congress for more than 40 years."

With respect to the question of weight, while the testimony of plaintiff's witnesses and defendant's witness Surak agreed the 25-pounds-or-under designation applied to kip, defendant's witness Geisel considered a weight of 30 pounds to be kip. Bailey agreed to the 30-pound figure and his later testimony expanded the weight to 35 pounds for kip. This testimony of defendant's witnesses Geisel

and Bailey appears to be based on their experience and the definitions contained in the ASTM designation D 1517–67, which was promulgated in 1967 and received in evidence as defendant's exhibit F, as well as defendant's exhibit I, the "Federal Test Method Standard," dated 1969. Defendant's exhibit E entitled "Military Standard Visual Inspection Guide for Footwear Upper Leather" (MIL–STD–663B), which was issued in 1971, indicates the square footage of calf and kip leather. Defendant, therefore, contends the weight and square footage has increased over the years and the importations are dutiable as classified.

It is to be noted that there is a difference of opinion as to the determination point of weight, as well as a lack of unanimity of opinion as to whether 20 square feet is the determination point for finished leather. This is due to the fact that the weight determination point according to the evidence may vary from under 25 to 35 pounds, thus resulting in various yields of square footage of the finished leather. In addition, the testimony with respect to tanning does not give a specific formula which may be utilized in determining the yield of the square footage of leather from the weight of the hide. The record further indicates that tanners utilize their own processes which may result in a yield of more or less square footage based upon the same weight.

Plaintiff further contends such distinction is presently recognized in the trade and that it has established a commercial designation. Where words used in tariff acts to designate particular kinds or classes of goods have well-known significance in the trade and commerce which differ from the common meaning, the commercial meaning prevails. *Maddock* v. *Magone*, 152 U.S. 368 (1894); *Jas. Akeroyd & Co. et al.* v. *United States*, 15 Ct. Cust. Appls. 440, T.D. 42641 (1928). Proof of commercial designation is a question of fact to be established in each case. *Daniel Green Shoe Co.* v. *United States* (*Trans World Shoe Corp., Party in Interest*), 58 Cust. Ct. 7, C.D. 2868, 262 F. Supp. 375 (1967), *appeal dismissed*, 54 CCPA 143. The record before the court fails to establish a commercial designation. It is incumbent upon the party alleging commercial designation to establish that such designation was definite, general, and uniform throughout the United States on or about the date of the enactment of the tariff legislation involved. *United States* v. *Armand Schwab & Co., Inc., et al.*, 30 CCPA 72, C.A.D. 218 (1942).

The second matter for determination is whether the imported leather, which arrived in bundles or pallets and contained leather both over and under 20 square feet, should be considered as claimed based upon the average size of the leather contained in the bundle or pallet. Plaintiff contends the average size of the leather contained in each bundle should be utilized since leather is dealt with in the trade

based upon an average. Plaintiff also brings to the court's attention that the testimony relating to weight for calf or kip was given in a range of weight in which the witnesses indicated an average weight.

Defendant takes the position that merchandise which contains various sizes, over and under 20 square feet, is commingled. According to general headnote 7 of the Tariff Schedules of the United States, commingled merchandise is subject to the highest rate of duty applicable to such merchandise unless the merchandise is segregated. The pertinent portions of general headnote 7 provide as follows:

> 7. *Commingling of articles.*—(a) Whenever articles subject to different rates of duty are so packed together or mingled that the quantity or value of each class of articles cannot be readily ascertained by customs officers (without physical segregation of the shipment or the contents of any entire package thereof), by one or more of the following means:
>> (i) sampling,
>> (ii) verification of packing lists or other documents filed at the time of entry, or
>> (iii) evidence showing performance of commercial settlement tests generally accepted in the trade and filed in such time and manner as may be prescribed by regulations of the Secretary of the Treasury,
> the commingled articles shall be subject to the highest rate of duty applicable to any part thereof unless the consignee or his agent segregates the articles pursuant to subdivision (b) hereof.

Assuming *arguendo* that the determination point in weight was 25 pounds or less and the square footage point was 20 square feet or less, since the merchandise contains under and over 20 square feet it is for tariff purposes commingled. It is further apparent that there has been no segregation of the merchandise and, therefore, it is dutiable at the highest rate applicable to the merchandise as prescribed by general headnote 7.

The question of utilizing averages was considered in *Robinson-Wagner Co., Inc.* v. *United States*, 40 CCPA 80, C.A.D. 501 (1952). In the *Robinson* case, certain wool grease was classified as wool grease suitable for medicinal use. The merchandise was imported in drums, some of which was of one tariff character, as classified, and some of another tariff character, wool grease containing 2 percent or less of free fatty acids and not suitable for medicinal use. The court in considering the question of average samples made the following observations:

> It will be remembered that the merchandise was imported in drums and from the record it is reasonable to believe that the contents of the individual drums differ in their chemical composition.
> It seems to us, as was argued by counsel for the Government, that if a drum of grease, such as was sampled by the Customs

officials, were to be mixed with one or any number of drums containing less than the components and character of adeps lanae, the result of such composite sample would probably in some degree conform to the samples and analyses made by employees of appellant in their tests. Therefore, we agree with the reasoning in the decision of the trial court that the composite sample representing an average, must be of lesser quality than the contents of the drums which held the better quality of the shipment.

The Customs Court in its decision in the *Robinson* case, 27 Cust. Ct. 158, C.D. 1363 (1951), made the following pertinent observation which likewise applies to general headnote 7:

> We are not unmindful of the fact that the plaintiff may have ordered and expected to receive wool grease not suitable for medicinal use, and that the average of the entire shipment actually was just such wool grease. The fact is, however, that the shipment was packed in drums, and the evidence establishes that some of the drums contained wool grease of the highest class. The policy of the law in such cases is indicated by section 508 (Tariff Act of 1930), *supra*, and is to assess duty, not upon the average of the classes of merchandise in a shipment, but upon the highest class thereof if the classes involved can be segregated and the segregation is not done.

Accordingly, in the absence of segregation, the merchandise was properly classified.

Judgment will be issued accordingly.