**HEADS AND THREADS, DIVISION OF MSL INDUSTRIES, INC.**
v.
**UNITED STATES.**

**Protest 64/13886–76557; C.D. 3374.**

United States Customs Court, Second Division.
March 26, 1968.

Barnes, Richardson & Colburn, New York City (Joseph Schwartz, New York City, of counsel), for plaintiff.

Edwin L. Weisl, Jr., Asst. Atty. Gen. (Morris Braverman, New York City, trial attorney), for defendant.

Before RAO, FORD, and MALETZ, JJ.

MALETZ, Judge:

The issue in this case is the proper classification of various sized articles invoiced as "Finished Hex Head Bolts Less Nuts Washer Faced Bright Finished." The merchandise was classified by the collector under paragraph 397 of the Tariff Act of 1930, as modified by T.D. 54108, as manufactures of metal not specially provided for and assessed with duty at 19 percent ad valorem. Plaintiff-importer claims that the merchandise is dutiable at the rate of ½ cent per pound as "Bolts, with or without threads or nuts * * * of iron or steel" under paragraph 330 of the Tariff Act of 1930, as modified by T.D. 51802.

Paragraph 397, as modified by T.D. 54108, reads, in part:

Articles or wares not specially provided for, whether partly or wholly manufactured:

\* \* \* \* \* \*

Composed wholly or in chief value of iron, steel * * * or other base metal (except lead), but not plated with platinum, gold, or silver, or colored with gold lacquer:

\* \* \* \* \* \*

Not wholly or in chief value of tin or or tin plate:

\* \* \* \* \* \*

Other, composed wholly or in chief value of iron, steel * * * (except the following: * * *

screws, commonly called wood screws, having shanks not exceeding 12/100 inch in diameter; screws, other than those commonly called wood screws, having shanks or threads not exceeding 24/100 inch in diameter; * * *)
. . .     19% ad val.

Paragraph 330, as modified by T.D. 51802, reads, in part:

Bolts, with or without threads or nuts, and bolt blanks, of iron or steel . . .     ½¢ per lb.

The record [1]—by way of introduction—establishes that four articles received in evidence (over defendant's objection) are representative samples of the importations involved in this case (see R. 6–16); that the importations consist of steel pins or rods or strong wire, having a hexagon head at one end and screw thread upon the other, which are used to join or fasten together two pieces of metal (or other articles) either by insertion into a tapped hole [2] or by attaching a nut; and that they have a washer face [3] but not chamfered points.[4] The record also establishes that the plaintiff buys the importations as finished hex head bolts, less nuts, washer faced, and sells them as hex head cap screws. The parties stipulated that the merchandise is composed of iron or steel.

Against this background, plaintiff contends that the articles in question fall within the common meaning of the term "bolts" as that term existed on and prior to June 17, 1930 (when the Tariff Act of 1930 was enacted). Defendant insists, on the other hand, that the common meaning of the term "bolts" does not in-

[1]. The record in the case consists of the oral testimony of four witnesses for the plaintiff and eight witnesses for the defendant, together with sixteen exhibits, seven of which were offered by plaintiff and nine by defendant.

[2]. A "tapped hole" is a hole drilled in a piece of metal or other object and then tapped with a thread. The fastening is accomplished by engagement of the screw thread of the "head cap screw" with the

thread in the inner surface of the tapped hole.

[3]. The washer face is a raised rim on the bottom surface of the hexagon head. It gives the head sufficient strength to withstand torquing, and also enables the articles to "seat" properly without scratching from the corners of the hexagon.

[4]. A chamfered point is made by cutting a 45-degree angle at the end of the shank. It resembles a groove or fluting.

clude the articles involved. It adds that in any event it has proven that the commercial designation of the term "bolts" on and prior to June 17, 1930, does not encompass the merchandise in issue.[5] To this plaintiff argues that defendant has failed to prove a commercial designation for the term "bolts" and that the present importations were excluded from that term. Plaintiff further contends that its evidence establishes a commercial meaning of the term "bolts" which is the same as the common meaning and which includes the articles in controversy.

We consider first whether the common meaning of the term "bolts" as used in paragraph 330 includes cap screws. Directly in point is Morris Supply Co. v. United States, 52 Cust.Ct. 174, C.D. 2457 (1964), where the merchandise was described on the invoice as head cap screws, and was also described by the only witness in the case as a cap screw, a hexagon-headed machine bolt, or merely under the designation "bolts." The assessment was under paragraph 397 of the Tariff Act of 1930, as modified, as articles or wares of iron or steel not specially provided for, at 19 percent ad valorem. The claim of the importer was that the articles should be classified under paragraph 330, as modified, as bolts, with or without threads or nuts, at ½ cent per pound. There was no attempt to prove a commercial designation and the court, therefore, had to determine the common meaning of the word "bolt." In so doing, the court reviewed various dictionary definitions, including Webster's New International Dictionary of the English Language, Unabridged (1929), in which connection it stated (52 Cust.Ct. at pp. 177–178.

The merchandise involved herein is known, among other things, as a "cap screw." Webster's New International Dictionary of the English Language,

unabridged (1929), gives the following definitions of this term:

cap screw. A headed bolt used without a nut; a tap bolt.

The term "tap bolt" is defined in said source as:

tap bolt. *Metal Working.* A headed bolt for screwing into a hole, used without a nut. See BOLT, *Illust.*

"Bolt" and "screw" are defined in said source as follows:

bolt * * * 5. A strong pin, of iron or other material, used to fasten or hold something in place, often having a head at one end and a screw thread cut upon the other end. Bolts are of many kinds and are given various names, according to: (1) The general shape of the head, as *cheese head, countersunk head, round head, square head,* etc. (See HEAD). (2) Some peculiarity in the shape of the head, as *eye, ring,* etc. (3) The mode of securing, as *screw, fox, key, jag, bay, clinch,* etc. (4) The use or application, as *belt, bridge, carriage, coupling, elevator, fish, king, roof, stud, stove, tire,* etc. Definitions of such as are distinctive enough to call for special treatment will be found in their vocabulary places. Cf. TAP BOLT, SCREW BOLT, STUD BOLT.

screw * * * 1. Any of several varieties of a common mechanical device consisting in its simplest form of a continuous helical rib or "thread" with the cylindrical shank or spindle from which it projects;—call specif. *external,* or *male, screw.* Also, the corresponding part into which this external, or male, screw advances and fits when the end of it is inserted and the screw turned in the proper direction;—called specif. *internal,* or *female, screw.* This latter may be considered as just enough of the material around the hold [sic] to give conformation to the helical rib and depression.

**5.** At the trial defendant's counsel indicated that the government was relying only on commercial designation. R. 62. See also R. 48, 51–54, 91, 217.

Cf. NUT, n., 8. The screw is used in its various forms to unite parts, as of wood or metal, to give an accurate traversing movement (as in changing the rotary motion of machine wheels into a slow traverse for a feed motion or the like), to give the final adjustments to delicate instruments, to transmit power (esp. when a large mechanical advantage and nonreversible motion are desired), etc. There are many special shapes of threads for machine screws, the common standards being shown in the *Illust.*

Webster's Dictionary, supra, gives the following definition of the term "nut":

> nut * * * 8. A perforated block (usually a small piece of metal), with an internal, or female, screw thread, used on a bolt, or screw for tightening or holding something, or for transmitting motion.

The court in *Morris Supply*—in an opinion by Judge Ford, excerpts from which follow—concluded that the importations were "bolts" within the common meaning of paragraph 330 of the tariff act (52 Cust.Ct. at p. 178):

> [A] review of the foregoing definitions covering cap screws, bolts, screws, tap bolts, and nuts, and many other definitions of the foregoing in various other authorities certainly beclouds the distinction between bolts and screws. *However, it would seem that the definitions of the term "cap screw," given in the various authorities, overwhelmingly and with few exceptions, relegate said items to a bolt category, i. e., screw bolt, headed bolt, threaded bolt, or tap bolt.* It is also interesting to note that whereas the definition set forth in Machinery's Encyclopedia * * * indicates that nuts are used with bolts in the generally accepted meaning of the term, the dictionary definition of the term, "nut," is indicative of the fact that nuts are also used with screws. [Emphasis added.]

> Even if exhibit 1 is designated by name as a screw, i. e., a "cap screw,"

by definition, it is a bolt. As the Tariff Act of 1930 provides only for screws, commonly known as "wood screws," "cap screws" could not find classification thereunder. Since the imported cap screws by definition are bolts, classification under paragraph 330 of the Tariff Act of 1930, as modified * * * being an *eo nomine* provision, is more specific than the basket provisions of paragraph 397 of the Tariff Act of 1930, as modified, supra, under which said merchandise was classified.

Classification of exhibit 1 as a "bolt" does not in any way do violence to the consistent distinction by Congress between "screws" and "bolts." It is obvious that wood screws of other than iron or steel; machine screws; or any other article defined as a "screw" (not commonly called a "wood screw") is properly subject to classification under the provisions of paragraph 397 * * *.

■■ The common meaning of a tariff term is, of course, a legal question for resolution independently by this court. E. g., Marshall Field & Co. v. United States, 45 CCPA 72, C.A.D. 676 (1958). In such circumstances, the holding in *Morris Supply*—that the common meaning of "bolts" includes "cap screws"—is a controlling precedent here unless clear error is shown requiring that it be overruled. E. g., Jas. Akeroyd & Co. v. United States, 15 Ct.Cust.Appls. 440, 443, T.D. 42641 (1928); R. J. Saunders & Co., Inc. v. United States, 54 CCPA ——, C.A.D. 898 (1966). No such showing has been made here; indeed, defendant in that part of its brief dealing with the "common meaning" question merely reargues (in largely identical language) the same contentions that it made in its *Morris Supply* brief. In light of the fact that each of these contentions was given careful consideration by the court in its opinion—but found to be unpersuasive, we see no basis for departing from our holding in the prior case.

Nor is there any doubt that the present importations are similar to those in *Morris Supply*, having a hexagon head at one end, a washer face under the head, and a screw thread at the other. The importations, in both cases, are used with or without nuts—and for the same purposes, and plaintiff's witnesses testified that in their opinion the four sample exhibits fell within the dictionary definition of the word "bolt" as quoted by this court in Winter, Wolff & Co., Inc. v. United States, 54 Cust.Ct. 173, 176, C. D. 2528 (1965) from Webster's New International Dictionary (2d ed.):

> bolt * * * 5. A pin or rod, esp. of steel, to fasten or hold something in place, often having a head at one end and a screw thread cut upon the other end. * * *

■■ It is true that the articles in *Morris Supply* are of greater diameter and longer length than the present importations. But this is of no consequence since it was not the intention of Congress to limit the provisions of paragraph 330 of the act to bolts of particular sizes. John L. Westland & Son, Inc. v. United States, 42 Cust.Ct. 229, C.D. 2091 (1959). It is also true that the articles in *Morris Supply* contain chamfered points and are in a blackened condition, whereas the present importations lack chamfered points and are bright finished. But these differences, too, are without consequence. In none of the dictionary definitions is there any reference to chamfered or unchamfered points or to blackened or unblackened conditions. The conclusion, in short, is that the articles involved fall squarely within the common meaning of the term "bolts" under paragraph 330 of the Tariff Act of 1930, as modified.

■ We come now to defendant's contention that the commercial designation of the term "bolts" does not cover the importations in question—a contention which, of course, defendant has the burden of proving. For "[i]t is elementary * * * that the common and commercial meanings of tariff terms are presumed to be the same . * * * [and] that he who asserts that a tariff term has a meaning in the trade and commerce of the United States which is different from its common meaning has the burden of proof." United States v. Wilfred Schade & Co., 16 Ct.Cust.Appls. 366, 370, T.D. 43092 (1928). See also e. g., C. J. Tower & Sons v. United States, 41 CCPA 195, 199, C.A.D. 550 (1954); Nylos Trading Company v. United States, 37 CCPA 71, C.A.D. 422 (1949). This rule of commercial designation "was intended to apply to cases where the trade designation is so universal and well understood that the Congress, and all the trade, are supposed to have been fully acquainted with the practice at the time the law was enacted." Jas. Akeroyd & Co. v. United States, supra, 15 Ct.Cust. Appls. at 443. See also e. g., United States v. Fung Chong Co., 34 CCPA 40, 42, C.A.D. 342 (1946). In such circumstances, to establish commercial designation it must be shown that at the time of enactment of the tariff law in question, the precise statutory term had a definite, uniform and general meaning in the trade and commerce of the United States which was different from its common meaning. United States v. Wilfred Schade & Co., supra, 16 Ct.Cust.Appls. at 371; United States v. Julius Wile Sons & Co., 22 CCPA 267, T.D. 47327 (1934); United States v. Fung Chong Co., supra, 34 CCPA at 42. That proof must then be followed by competent evidence establishing what that commercial meaning was. E. g., B. R. Anderson & Co. v. United States, 10 Cust.Ct. 148, 149, C.D. 740 (1943); Jas. Akeroyd & Co. v. United States, supra, 15 Ct.Cust.Appls. at 442. Similarly, where a party seeks to establish that merchandise is not included within the commercial meaning of a tariff term, it is a requisite that his proof show first, that the term had a commercial meaning in the trade differing from its common meaning; second, what that commercial meaning was; and third, that that meaning did not include the merchandise in controversy. Ibid. It is not sufficient to show that

at or prior to the enactment of the tariff law, the merchandise was always known by a name other than the tariff term. E. g., United States v. Julius Wile Sons & Co., supra, 22 CCPA 267; United States v. Wilfred Schade & Co., supra, 16 Ct.Cust.Appls. at 371; United States v. Lilly & Co., 14 Ct.Cust.Appls. 332, 338–339, T.D. 41970 (1927). Thus in United States v. Fung Chong Co., supra, 34 CCPA 40, the government sought to establish a commercial meaning of the term "oranges" in an effort to meet an earlier decision that the common meaning of the word "oranges" included kumquats. The court pointed out that although government witnesses testified that the term "orange" had a commercial meaning different from its common meaning, they did not inform the court as to such commercial meaning. The most that these witnesses testified to, the court noted, was that the term "kumquats" was excluded from the commercial meaning of the term "orange." The court concluded that "[i]n the absence of any testimony as to the commercial meaning of the term 'orange' the statement of the witnesses that the involved merchandise was excluded from that term is insufficient to prove commercial designation." Id. at 44. In view of these considerations, the court affirmed the decision of this court that kumquats fell within the common meaning of "orange" and were dutiable as oranges, and that the government had failed in its burden of proving (1) a different commercial meaning of oranges, and (2) that the kumquats were excluded from that meaning.

An early case on the same point is Sidenberg v. Robertson, 41 F. 763 (C.C., S.D.N.Y., 1890) where the question was whether the imported merchandise was classifiable as "cotton laces." The importer, in an attempt to prove commercial designation, established that the merchandise was known, at and prior to the enactment of the Tariff Act of 1883, by names other than "cotton laces." The judge charged the jury in the following language (41 F. at 766):

* * * Wheat is a grain, and no amount of testimony that wheat was never bought and sold in trade by any other name than "winter wheat," that that was the only name which was used with regard to it, and that it was never known as "grain" in the trade would take it out of the classification of "grains," unless it was also shown that the word "grain" had been distorted from its natural meaning, and was used by the trade in a restricted meaning, covering only cereals other than wheat. So, in the case before us, in order to take this class of goods which, as a "fabric of fine threads of cotton, interwoven in a net, and often ornamented with figures," is within the dictionary meaning of the words "cotton laces," out of that class, the plaintiff must satisfy you, by a fair preponderance of proof, that at the time this act was passed, (March 3, 1883,) and prior thereto, the words "cotton laces" had in the trade and commerce of this country (that is, in the trade and commerce carried on between importers and large dealers, in transactions at wholesale, transactions where the parties on both sides of the transaction were in the business) a peculiar or technical meaning, and that such technical trade meaning excluded these articles. * * *

These considerations are equally applicable here where the defendant contends that the commercial designation of the term "bolts"—in contrast to its common meaning—does not include the articles in controversy. This is to say that the defendant does not make out its case simply by showing that on and prior to June 17, 1930, when the Tariff Act of 1930 was enacted, the articles were always commercially known and bought and sold as "cap screws"—a term for which there is no tariff provision. Rather (as we have seen), the defendant has the burden of proving first, that on and prior to June 17, 1930, the statutory term "bolts" had a definite, uniform and general meaning in the trade and commerce of the United States which

differed from the common meaning; second, what that commercial meaning was; and third, that that meaning did not include the articles in controversy.

In this setting, the defendant presented at trial eight witnesses in support of its position that the commercial designation of a "bolt" as known and understood within the fastener industry prior to June 17, 1930, was essentially different and distinct from the commercial designation during that same period of a "hex head cap screw." All but one of these witnesses had extensive sales experience in the fastener industry prior to June 17, 1930, and their combined experience covered every area within the United States.

The defendant's witnesses testified on direct examination that within the fastener industry prior to June 17, 1930, there was a commercial distinction between "cap screws" and "bolts" based primarily on the method employed by each to achieve the desired fastening. They further testified that the commercial designation and understanding of a bolt in its basic form, as understood in the trade and commerce of the United States prior to June 17, 1930, was a headed and shanked article which was to be passed into and through a hole and made fast by tightening a nut on the threaded bolt shaft extruding from the hole. They stated that a bolt was never manufactured or sold with a washer face.

The witnesses testified that a cap screw, by contrast, was inserted into but not through a hole in one of the objects intended to be fastened, which hole was pre-threaded or "tapped" so that the threads on the shaft of the cap screw engaged the threads in the inner surface of the tapped hole. They stated that prior to June 17, 1930, the characteristics of a cap screw were its hexagon head, a washer face under the head, concentric threads, and a chamfered point.[6] They emphasized that the washer face was an essential feature distinguishing a cap screw from a bolt and that its presence on the cap screw was necessary to give the head sufficient strength to withstand torquing and to obtain a proper seating of the cap screw as it was tightened.

The defendant's witnesses identified representative samples of the articles in controversy as having a hexagon head, a washer face, concentric threads, but lacking a chamfered point. They further testified that the samples, notwithstanding the lack of a chamfered point, are cap screws and that prior to June 17, 1930, articles similar to the samples were sold under the name of cap screws and by no other name.

Three of the defendant's witnesses identified sales catalogues that they had used during their sales experiences prior to June 17, 1930, and these catalogues were introduced in evidence to show that cap screws were classified in such a way as to indicate that they were separate articles of commerce from bolts, possessing physical characteristics not possessed by bolts. In the main, these physical characteristics related to the presence of a washer face under the head and the uniform offering of a cap screw without any accompanying nut in contradistinction to the manner in which bolts were offered with nuts.

Lastly, the defendant's witnesses testified on direct examination that prior to June 17, 1930, cap screws were never sold with nuts; that bolts were always torqued by turning the nut; that bolts were always used in connection with a nut; that bolts were not suitable for use in a tapped hole; and that prior to June 17, 1930, articles similar to those in issue would not have been sold within the industry under the term "bolts."

On cross-examination, however, a somewhat different picture emerged. One of defendant's witnesses who had testified on direct that a bolt must be used with a nut conceded that if used without a nut, it was still "a bolt, less the

---

6. The testimony indicates that a chamfered point is a desirable but not an essential feature to facilitate easy entry of the screw into the tapped hole.

nut." (R. 72) Another witness reiterated that the distinction used in the industry "at that time" was that the cap screw was used in a tapped hole, while a bolt was used with a nut, but admitted that if a cap screw were used with a nut, it would make a bolt out of it. (R. 128) The same witness was confronted with his own 1927 catalogue which described bolts as used in tapped holes. (R. 128–29) He finally agreed that the fact that a fastener was used in a tapped hole did not mean it was not a bolt. (R. 130–31) The witness further testified that as he understood the term "bolt" it had to have a square head, and that anything that did not conform to that was not considered by the trade to be a bolt. He admitted, however, that "milled coupling bolts" and "steel coupling bolts," having very large *hexagon* heads, were listed in his own catalogues as bolts, and conceded they were a kind of bolt. (R. 134)

Beyond this, two of defendant's witnesses testified on cross-examination that if they had received an order for bolts with washer face, they would have understood what was meant and would have shipped hexagon head cap screws like those involved here. (R. 102–03, 132)

Three witnesses testified for plaintiff in rebuttal. Each had extensive experience in the fastener industry prior to June 17, 1930, and their combined experience—as in the case of the defendant's witnesses—covered every area of the United States. Their testimony—which was essentially unimpeached—was (i) that the meaning in the trade of the term "bolt" was the same as the dictionary meaning quoted by this court in Winter, Wolff & Co. v. United States, supra, 54 Cust.Ct. at 176, i. e., "A pin or rod, esp. of steel, to fasten or hold something in place, often having a head at one end and a screw thread cut upon the other end"; (ii) that that meaning was definite, uniform and general throughout the trade. and commerce of the United States; and (iii) that the articles in issue were standard bolts and would be included within the commercial meaning of

the term "bolt" as understood on and prior to June 17, 1930, regardless of the fact that they had a washer face, might be called hexagon head cap screws, were torqued by the head, had a hexagon head, had concentric threads, were used in a tapped hole, were used with or without nuts, and regardless of the composition of the steel used in their manufacture.

In addition, there was received in evidence as a plaintiff exhibit a "Report of the National Screw Thread Commission (Revised, 1928) (authorized by Congress, July 18, 1918, H.R. 10852)"—published by the Bureau of Standards of the U. S. Department of Commerce in 1929—which states: "All finished bolts are washer faced." A further plaintiff exhibit captioned "Tentative American Standard—Wrench-Head Bolts and Nuts and Wrench Openings"—prepared by Sub-Committee No. 2 of the Sectional Committee on the Standardization of Bolt, Nut and Rivet Proportions, and approved by the American Engineering Standards Committee in February 1927—states similarly that "All finished bolts shall be washer faced. * * *"

On the basis of the record thus summarized, and considering the defendant's testimony in the light most favorable to it, the most that it has established is that the imported articles were commercially known as "cap screws" on and prior to June 17, 1930—a term which is not in the statute. But, as we have seen, this is scarcely sufficient to remove the articles from classification. as "bolts." What must be shown by the defendant is that on and prior to June 17, 1930, the term "bolts" had a definite, uniform and general commercial meaning in the trade which differed from its common meaning and excluded "cap screws." And this showing, it is clear, the defendant has not made. In the first place, its own witnesses were by no means in agreement that a "bolt" was limited to a type of fastener that lacked a washer face and was used with a nut, and that a "cap screw" was limited to a type of fastener that contained a washer face and was used in a tapped hole. Thus, several of

the government's own witnesses conceded (as previously set out) that if a bolt were used without a nut, it was still a bolt; that if a cap screw were used with a nut, it would become a bolt (albeit that it contained a washer face); and that the fact that a fastener was used in a tapped hole (i. e., without a nut) did not mean it was not a bolt. Further, two government witnesses testified that if they received an order for a bolt with a washer face, they would fill it by shipping cap screws. Such testimony—by the government's own witnesses—precludes a finding that the imported cap screws were not also known as bolts. See e. g., Nylos Trading Company v. United States, supra, 37 CCPA at 74, 81; Meyer & Lange et al. v. United States, 6 Ct.Cust.Appls. 181, 183, T.D. 35436 (1915).

Another factor is the statement in the report of the National Screw Commission —published in 1929—that all finished bolts are washer faced. When it is considered that this report was prepared many years before the commencement of the present litigation and was based on facts supplied by persons in the industry, it supports a conclusion that in 1929 all finished bolts were washer faced and that the testimony of government witnesses to the contrary was mistaken. Relevant too is the statement contained in the "Tentative American Standard" that "All finished bolts shall be washer faced." While these standards were tentative, having been approved by the American Engineering Standards Committee in February 1927, they necessarily were based upon trade nomenclature as understood in the industry—which is to say that as of 1927 the industry recognized that a bolt was characterized by the presence of a washer face. Added to this is the unimpeached and consistent testimony of plaintiff's rebuttal witnesses that on and prior to June 17, 1930, the commercial meaning in the trade of

the term "bolts" was the same as the dictionary meaning quoted by this court in *Winter, Wolff.*

 In view of these considerations, it is apparent that the defendant has failed to prove by a preponderance of the evidence that on and prior to June 17, 1930, the term "bolts" had a definite, uniform and general commercial meaning which differed from its common meaning, and that the cap screws in question were excluded from that meaning.[7] We hold, therefore, that the articles in controversy are properly dutiable as "bolts" under paragraph 330 of the Tariff Act of 1930, at the modified rate of ½ cent per pound. The protest is sustained and judgment will be entered accordingly.

RAO, C. J., and FORD, J., concur.

---

**7.** Some of the defendant's witnesses suggested that bolts were made of low carbon or cheaper steel than cap screws and that the dividing line was 20/1000 of carbon. Even by this test the articles in question are bolts. For the U. S. Customs Laboratory Report shows that the sample exhibits have a carbon content ranging from 9/1000 to 1.1/1000.