(C.D. 4495)

FLORSHEIM SHOE COMPANY, DIVISION OF INTERCO, INC.
*v.* UNITED STATES

Court No. 71-8-00938

(Decided December 26, 1973)

*Barnes, Richardson & Colburn* (*Joseph Schwartz* of counsel) for the plaintiff.

*Irving Jaffe*, Acting Assistant Attorney General (*Martin L. Rothstein* and *Frank J. Desiderio*, trial attorneys), for the defendant.

MALETZ, Judge: The question in this case concerns the proper tariff classification of leather made of India water buffalo calfskin. The leather—which was exported from Italy and entered at the port of Chicago in 1970—was classified by the government under item 121.30 of the tariff schedules as calf upper leather and assessed duty at the rate of 10% ad valorem.

Plaintiff contends that this classification is erroneous and claims that the importation is properly classifiable under item 121.57 as "not fancy" other leather, dutiable at the rate of 7%.

The pertinent provisions of the tariff schedules read as follows:

> Leather in the rough, partly finished, or
>     finished:
>      *        *        *        *        *        *        *

Other:
    Calf and kip:

121.30                Upper _____ 10%  ad  val.

    *       *       *       *       *       *       *

Other:
    Not fancy:

    *       *       *       *       *       *       *

121.57                         Other _____ 7%  ad  val.[1]

The parties agree that water buffalo calfskin leather comes within the common meaning of the term "calf leather." In this circumstance, the sole issue is whether such buffalo calfskin leather is excluded, as plaintiff contends, from the commercial meaning of the term "calf leather" and, consequently, falls outside the scope of item 121.30— the tariff classification provision for calf upper leather. For the reasons that follow, the court sustains plaintiff's claim.

In support of its position, plaintiff called a zoologist and seven trade witnesses and introduced nine exhibits. Defendant, on the other hand, did not present any witnesses, but introduced one exhibit.

Dr. William Peter Crowcroft, the zoologist called by plaintiff, testified that the India water buffalo belongs to the genus "Bubalus" and the species "bubalis"; that domesticated cows or cattle belong to the genus "Bos" and the species "taurus"; and that Brahman cattle belong to the genus "Bos" and the species "indicus."[2] There are numerous differences, he indicated, between the India water buffalo and domestic cattle of the genus Bos, the most fundamental one being that they do not breed together.

Turning next to the seven trade witnesses called by plaintiff, five such witnesses were associated with tanneries. These were (1) Milton Frauendorfer, vice president of a tannery in Milwaukee, Wisconsin, which deals in cow calfskins and sells primarily to shoe manufacturers and also to manufacturers of "novelty" items, including belts, handbags, key cases and billfolds; (2) Roderick Wessel Correll, president of a tannery in Gloversville, New York, which manufactures and wholesales various types of finished leather, including buffalo calfskins,[3] and also sells raw skins; (3) Marte Loewengart, president of a tannery with subsidiaries in New York and Argentina, which manufactures and sells leather, including buffalo calf and cow calf leather, to manufacturers of shoes, wallets, belts, handbags and radio and

---

[1] The record shows that the imported merchandise is not "fancy" leather, and it is undisputed that it is not chamois, patent, upholstery, kip, pig, hog, goat or sheep leather, which classifications must be found inapplicable before reaching the question as to whether or not the imported merchandise may be classified under item 121.57 as "other" leather.

[2] According to Crowcroft, all animals of one kind that live and breed together, belong to a "species." He further stated that different species which are very much alike and have had common ancestry in the past are grouped together in a "genus."

[3] The term "buffalo" as used here and hereafter refers to the India water buffalo.

camera cases; (4) Philip G. Bernheim, vice president of a company located in Hoboken, New Jersey, which manufactures and sells to various manufacturers leather from animal skins and hides, including cow calfskins and buffalo calfskins; and (5) Hunter L. Barrett, president of a New Jersey company which tans calfskins of young cows and also, since 1963, buffalo calfskins, and sells mostly to shoe manufacturers.

Plaintiff's sixth trade witness was Samuel Gittler, vice president and partner in a New York City firm which is the "largest importer of leather into the United States," including cow calf and buffalo calf leather. The firm sells its imported leather primarily to manufacturers and also to wallet and handbag manufacturers.

The seventh trade witness called by plaintiff was Morris B. Madian, vice president of plaintiff-Florsheim, a shoe manufacturer, in which capacity he is in charge of purchasing "upper and lining leather," including cow and buffalo calfskin leather.

All of the trade witnesses, except Madian, have had extensive sales experience in the leather wholesale trade and their companies sell to customers throughout the United States. Madian, on the other hand, has purchased leather for Florsheim from over 200 tanneries located throughout the country.

All the trade witnesses were in agreement that the term "calf leather," or what the witness Loewengart referred to as "genuine calf," had a definite meaning in the wholesale trade in which they dealt in the United States prior to and on August 31, 1963, when the tariff schedules went into effect; that this meaning was uniform and general throughout that area of commerce; that the term referred to the leather of the domesticated calf within the genus Bos; that it uniformly excluded water buffalo calfskin leather; that an order for calf leather would not be filled by a delivery of water buffalo calfskin leather; and that buffalo calf leather did not move in the channels of trade under the designation, calf leather.

It is to be added, however, that there was some difference of opinion among the witnesses as to whether the leather produced from young Brahman cattle (Bos indicus) would be commercially recognized as "calf leather." Also, while agreeing that kip referred to the skin of an older calf, and differed from calfskin only in size, the witnesses were not in agreement as to what stage—whether measured in terms of square feet or weight—calf became kip for trade purposes.

On a further aspect, it is to be observed that various exhibits in the record denote a distinction between cow calfskin and buffalo calfskin. Thus, the index to leathers contained in the 1958 and 1963 editions of the *Leather and Shoes Blue Book*—which was characterized by the witness Madian as the "bible" of the shoe industry—lists buffalo

leather separately from calf leather; a sheet from the *Weekly Bulletin Leather and Shoe News*, dated August 25, 1956, contains an advertisement by the witness Bernheim's company listing the various types of leather it sold, including "calf," "kip" and "buffalo," among others; the *International Dictionary of the Leather and Allied Trades*, 1951, contains separate listings for "buffalo" and "calf"; and *The Chemistry and Technology of Leather*, 1962, has separate chapters on "The Manufacture of Leather from Calfskin" and on "Novelty Leathers," the latter including buffalo.[4]

Additionally, examination of a representative sample of the imported water buffalo calfskin leather, and a sample of cow calfskin leather, reveals that the buffalo calf leather is heavier, thicker and less supple than the cow calfskin leather and has a deeply textured or grained surface which is coarse to the touch, whereas cow calfskin leather has a very smooth, soft surface with light indistinct markings.

Against this background, defendant contends that plaintiff has failed to sustain its burden of proving the claimed commercial designation for calf leather, asserting that it has not established a commercial meaning for the term which is "definite, uniform and general." In effect, the thrust of its attack is that the testimony of the trade witnesses, whose qualifications, experience and credibility were unchallenged, is not in absolute harmony on all matters.

As to this, we start with the basic rule that tariff terms are drafted in the language of trade and commerce which is presumptively the same as that in common use. E.g., *Swan* v. *Arthur*, 103 U.S. 597 (1880) ; *C. J. Tower & Sons* v. *United States*, 41 CCPA 195, C.A.D. 550 (1954) ; *United States* v. *M. J. Brandenstein & Co.*, 17 CCPA 480, T.D. 43941 (1930) ; *Meyer & Lange* v. *United States*, 6 Ct. Cust. Appls. 181, T.D. 35436 (1915). Where, however, it is affirmatively established that a tariff term, at the time it was enacted into law, had a meaning in the trade and commerce of the United States which differed from the common meaning and was uniform, definite and general, such meaning will be adopted, unless a contrary intention of Congress is clearly manifested. *Cadwalader* v. *Zeh*, 151 U.S. 171 (1894) ; *United States* v. *Georgia Pulp and Paper Manufacturing Co.*, 3 Ct. Cust. Appls. 410, T.D. 32998 (1912) ; *United States* v. *Wilfred Schade & Co.*, 16 Ct. Cust. Appls. 366, T.D. 43092 (1928) ; *Nylos Trading Company* v. *United States*, 37 CCPA 71, C.A.D. 422 (1949).

Proof of commercial designation is a question of fact to be established in each case. *Daniel Green Shoe Co.* v. *United States*, 58 Cust.

---

[4] The Florsheim shoe catalogue for Spring 1972, which is distributed solely for dealer use, describes all shoes made of buffalo calfskin leather as "Calais calf," whereas shoes made from cow calfskin leather are described under other names, such as "Cashmere," "Dolce" or "Nairobi" calf.

Ct. 7, C.D. 2868, 262 F. Supp. 375 (1967). It is generally recognized that the principal source of evidence that the commercial meaning contended for is general, definite and uniform throughout the wholesale trade at or prior to enactment of the involved statute should come from those persons who actually deal in, or are conversant with the wholesale trade in which the merchandise travels and the designation it receives therein. *The Hy-Glow Company* v. *United States*, 58 Cust. Ct. 481, C.D. 3023 (1967). See also *Rice Millers' Association* v. *United States*, 15 Ct. Cust. Appls. 355, T.D. 42560 (1928); *Daniel Green Shoe Co.* v. *United States, supra*, 58 Cust. Ct. 7.

As the court stated in *Heads and Threads* v. *United States*, 60 Cust. Ct. 308, 313, C.D. 3374, 282 F. Supp. 484, 489 (1968):

> * * * This rule of commercial designation "was intended to apply to cases where the trade designation is so universal and well understood that the Congress, and all the trade, are supposed to have been fully acquainted with the practice at the time the law was enacted." *Jas. Akeroyd & Co.* v. *United States, supra*, 15 Ct. Cust. Appls. at 443. See also e.g., *United States* v. *Fung Chong Co.*, 34 CCPA 40, 42, C.A.D. 342 (1946). * * *

The plain import of *Akeroyd* and *Heads and Threads* is that a finding of commercial designation requires that the testimony of witnesses in the trade or industry show, without substantial conflict, that at the time of enactment there was a definite, uniform and general meaning in the trade and commerce of the United States for the tariff term in issue which differs from its common meaning, and which either embraces or, as in this case, excludes the imported merchandise.

The background and experience of plaintiff's witnesses in the calfskin leather industry are broad and impressive: all were in business long prior to the enactment of the tariff schedules and were in a position to know whether calf leather had a specialized meaning in the trade, a point on which all agreed, and on which they were fully supported by the documentary evidence.

All the trade witnesses were in accord that at or prior to August 31, 1963, the term "calf leather" referred in the wholesale trade to the leather of young domesticated cows or cattle within the genus Bos; that it excluded buffalo calf leather; and that a delivery of the latter would be unacceptable to fill an order for calf leather.[5] Defendant failed to refute or rebut their testimony on any of these points.

Furthermore, while physical appearance and characteristics are not always of significance when claiming a commercial meaning for a tariff term which excludes the imported merchandise, it is worthy of observa-

---

[5] In accordance with an order of the court granting defendant's motion pursuant to rule 10.4(d) for exclusion of proposed witnesses, when each trade witness testified, the others (except Madian who acted as advisor to plaintiff's counsel) were excluded from the courtroom.

tion that the differences in appearance, texture and feel between buffalo calf leather and cow calf leather, as described above, are readily apparent even to the layman.

The court is satisfied that the evidence establishes that the buffalo calf leather in issue does not move in commerce as "calf leather" or "calf upper leather" and is excluded from the commercial meaning of these terms.

The fact that the witnesses did not agree as to the exact size or weight at which calf becomes known in the trade as "kip" is immaterial since item 121.30, under which the merchandise was classified, provides for both calf and kip. See *C. J. Tower & Sons* v. *United States*, 45 CCPA 43, C.A.D. 670 (1957). By the same token, we do not think it crucial to plaintiff's case that the witnesses did not agree as to whether calf leather included leather from all species of the genus Bos, inasmuch as all agreed that the term "calf leather" was limited to leather from the calf of the genus Bos and did not include leather from the buffalo calf which (as noted previously) is within the genus Bubalus. See e.g., *C. J. Tower & Sons* v. *United States, supra; United States* v. *C. J. Tower & Sons*, 40 CCPA 14, C.A.D. 491 (1952); *Michigan Bulb Company* v. *United States*, 31 Cust. Ct. 64, C.D. 1546 (1953). Particularly relevant in this connection is *United States* v. *Georgia Pulp and Paper Manufacturing Co., supra*, 3 Ct. Cust. Appls. 410, in which the court held that the term "machine tools" was confined to metal-working machines and did not include woodworking machines. In reaching this result, the court noted that the trade witnesses—

> * * * did not agree in several instances as to whether a given machine for the working of metal would or would not be a machine tool within the trade understanding, but they were at no disagreement that a machine tool was in the trade understood to be one that worked metal in some manner and was limited thereto. [3 Ct. Appls. at 413.]

To like effect, the rule of commercial designation may properly be invoked in the present case to exclude buffalo calf leather from classification as "calf leather." For the witnesses were in unanimous agreement that "calf leather" referred to the leather of young cows within the genus Bos, and excluded buffalo calf leather within the genus Bubalus, although they were not in complete accord as to when "calf" becomes "kip" and as to whether every single species of the genus Bos may be "calf leather."

Misplaced is defendant's reliance on *United States* v. *Fung Chong Co., supra*, 34 CCPA 40. In that case, the government sought to establish that kumquats, though within the common meaning of the term "oranges," were excluded from the commercial meaning of that term. The record showed, however, that the term "orange" was not used

by the trade and that there were so many varieties of oranges that the trade had to specify the type of orange. Further, although certain witnesses for the government testified that the term "orange" had a commercial meaning different from its common meaning, they did not inform the court as to such commercial meaning; the most that those witnesses testified to was that the term "kumquat" was excluded from the commercial meaning of the term "orange." In these circumstances, the court held that "[i]n the absence of any testimony as to the commercial meaning of the term 'orange,' the statement of the witnesses that the involved merchandise was excluded from that term is insufficient to prove commercial designation." 34 CCPA at 44. By contrast, in the present case, seven witnesses testified without contradiction that the term "calf leather" was used by the trade and that in the trade, the term covered leather from the calf of the genus Bos and did not include buffalo calf leather.

Additionally, there was evidence in *Fung Chong* that "commercially as well as commonly a kumquat falls within the general classification of 'orange'." 34 CCPA at 44. Here, on the other hand, the evidence is undisputed that while buffalo calfskin comes within the common meaning of the term "calf leather," commercially it is excluded from the meaning of that term.

Defendant further relies upon *Heads and Threads* v. *United States*, *supra*, 60 Cust. Ct. 308. That case is also distinguishable. There the government was seeking to establish a commercial meaning of the term "bolts," and that it excluded cap screws, but failed to show by satisfactory evidence what that meaning was. Beyond that, some of the government witnesses testified that they would ship cap screws to fill an order for bolts with a washer face. In addition, the *importer* presented proof to show that cap screws were in fact included within the commercial meaning of bolts. Obviously, we have no such situation here, since the plaintiff has established a commercial meaning which excludes buffalo calf leather from the term "calf leather" and has proven that an order for calf leather would not be filled by a delivery of buffalo calfskin leather.

Defendant also cites *Jas. Akeroyd & Co.* v. *United States*, *supra*, 15 Ct. Cust. Appls. 440, which simply reiterates that the rule of commercial designation does not apply except where the trade practice or nomenclature is universal in the trade, and not confined to some portion of the trade. In the present case, plaintiff has shown that buffalo calf leather is universally excluded from the commercial meaning of the term "calf leather."

Finally, *Daniel Green Shoe Co.* v. *United States*, *supra*, 58 Cust. Ct. 7, upon which defendant also relies, is likewise not in point because

there was a wide degree of conflict in the testimony of the witnesses as to the commercial meaning of the tariff term in dispute. Here, there is no conflict whatever in the testimony of the trade witnesses that the commercial meaning of calf leather excludes buffalo calf leather.

In summary, on the basis of the record, it is held that the imported merchandise is not "calf upper leather" within the meaning of item 121.30, but is properly dutiable as "not fancy" other leather under item 121.57. Plaintiff's claim is therefore sustained and judgment will be entered accordingly.