HARTOG FOODS INTERNATIONAL INC., PLAINTIFF *v.*
UNITED STATES, DEFENDANT

Court No. 87–07–00789

(Decided September 18, 1991)

*Barnes, Richardson & Colburn (Rufus E. Jarman, Jr., Melvin E. Lazar)* for plaintiff.
*Stuart M. Gerson,* Assistant Attorney General; *Joseph I. Liebman,* Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice *(Mark S. Sochaczewsky)* for defendant.

## BACKGROUND

MUSGRAVE, *Judge:* Plaintiff Hartog Foods International ("Hartog") imported apricot, peach and pear concentrate from 1984 until 1986. The merchandise was invoiced as "32 Brix"[1] "apricot [or peach or pear] concentrate" or "apricot [or peach or pear] puree concentrate," with or without other qualifying language. The products so imported shall be referred to collectively as "the concentrated fruits." Customs classified the merchandise under the following Items in Schedule 1, Part 9 of the TSUS:

> Subpart C. — Fruit Flours, Peels, Pastes, Pulps, Jellies, Jams, Marmalades and Butters
> \* \* \* \* \* \* \*
> Fruit pastes and fruit pulps:
> \* \* \* \* \* \* \*
> 152.42 — Apricot . . . . . . . . . . . . . . . . . . . . . . . . . . 13.8% ad val.
> \* \* \* \* \* \* \*
> 152.78 — Pear . . . . . . . . . . . . . . . . . . . . . . . . . . . 15% ad val.
> \* \* \* \* \* \* \*
> 152.88 — Other . . . . . . . . . . . . . . . . . . . . . . . . . . 15% ad val.

The Item under which plaintiff argues the merchandise is properly classifiable, in Part 12 of Schedule 1, reads as follows:

> Subpart A. — Fruit Juices
>
> Fruit juices, including mixed fruit juices, concentrated or not concentrated, whether or not sweetened:

---

[1] The "Brix" rating is a measurement of the percentage of the total product weight made up of sugar.

Not mixed and not containing over 1 percent of ethyl alcohol by volume:

\*     \*     \*     \*     \*     \*     \*

165.55 — Other ........................ 3 ¢ per gallon.

Plaintiff first argues that the merchandise is commonly classified in the fruit and beverage industry as fruit juice concentrate, not as fruit pulp. At trial, several of plaintiff's witnesses supported that position. Second, plaintiff argues that even assuming, *arguendo*, that the merchandise may properly be classified under either of the two proposed categories, the items under which Customs classified the merchandise are *eo nomine* provisions; that the item proposed by plaintiff is a *use* classification; and that a use classification is preferable to an *eo nomine* classification.

The concentrated fruits are the result of an eight-step process:

1. The various fruits are washed and scrubbed to eliminate rot and large debris.

2. The pits are withdrawn from the fruit.

3. The fruits are forced through a fine mesh screen to eliminate pit fragments, skin particles, and other, smaller debris.

4. The fruits are screened again through a finer mesh to reduce the particle size and quantity of the fruit fiber.

5. The fruits are introduced into stage one of the evaporator.

6. The fruits, now concentrated to a measure of approximately twenty Brix, are next introduced to the second stage of the evaporator, which raises the degree of concentration to thirty-two Brix.

7. Next, the concentrated fruits are introduced into a "wiping film tubular heat exchanger" which heats the concentrated fruits to between 185 and 195 degrees, thereby deactivating any enzymes and sterilizing the product.

8. Finally, the concentrated fruits are de-aerated to minimize oxidation due to trapped air, and the concentrate is introduced into an aseptic system for packaging, commonly known as the Scholle system.

The resulting concentrated product is commonly used as an ingredient in the preparation of fruit nectars, which are sweetened juice drinks. Plaintiff asserts that it is also used in various fruit juices, which list it on ingredient labels as fruit concentrates. The government argues that label descriptions notwithstanding, the concentrated fruits are fruit pulps. The question presented is whether, in their form after the eighth processing stage, the concentrated fruits were properly classified as fruit pulps or whether they should have been classified as concentrated fruit juices.

*Standard of Review:*

Customs' classifications of imported items, including their constituent elements and the facts necessary to classifications are presumed to be correct. The presumption is rebuttable and the party challenging the classification has the burden of proving it is incorrect. 28 U.S.C. § 2639(a)(1) (1991). *Stewart-Warner Corp. v. United States*, 748 F.2d

663, 665 (1984); *Gleeson v. United States*, 58 CCPA 17, 21, 432 F.2d 1403, 1406 (1970). Generally, the terminology comprising the TSUS Classification Items is construed in accordance with its common and commercial meanings, which are presumed to be the same. *Meyer & Lange v. United States*, 6 Ct. Cust. App. 181, 182 (1911); *Nippon Kogaku (USA), Inc. v. United States*, 69 CCPA 89, 92, 673 F.2d 380, 382 (1982). Because the tariff acts were originally designed as a source of revenue, their classification categories were phrased "according to the general usage and known denominations of trade." *Two Hundred Chests of Tea*, 22 U.S. (9 Wheat.) 430, 438, 6 L. Ed. 128, 130 (1824). Thus, the language of the TSUS generally must be interpreted in accordance with its meaning and use in the relevant commerce and trade.

The Court must consider whether the government's classification is correct, both independently and in comparison with the alternative proposed by the importer. *Jarvis Clarke v. United States*, 733 F.2d 873, 878 (Fed. Cir. 1984). When a plaintiff successfully rebuts the presumption of correctness attaching to the challenged classification, the Court may remand for reclassification by the Customs Service, or determine the proper classification itself. *Jarvis*, 733 F.2d at 878.

*The evidence:*

At trial, plaintiff presented six witnesses, several of whom participated in the development of the modern processes for producing concentrated fruit juices. All of plaintiff's witnesses stated that they had been involved in various respects with the merchandise at issue in this action, and that they were substantially familiar with its nature, commercial designation, and use. They agreed that the concentrated fruits are referred to in the industry as "concentrate," specifically, as apricot, peach, and pear concentrate, sometimes with the variation "puree concentrate." They testified that this thirty-two Brix concentrate has long been the standard ingredient in juices and nectars made from those three fruits in the United States, and that the overwhelming majority of the concentrate is used for that purpose. All of plaintiff's witnesses stated that the concentrates are concentrated from puree, and that the puree is a juice. Several were asked whether the concentrate or the unconcentrated fruit puree is a pulp and testified that it is not. According to their testimony, the word "pulp" refers to either an early, non-liquid stage of the processing or to the insoluble fiber and other solids that are removed during the processing. Exhibits and testimony indicated that during processing the pulp is transformed into a puree by forcing it through successively finer screens which remove insoluble fibrous material (or pulp) and progressively reduce the volume of the fruits. The puree becomes "concentrate" when most remaining water is removed by evaporation. The witnesses testified that the concentrated fruits can be reconstituted to a "single-strength" juice or beverage by reintroducing water to the concentrated form.

Among plaintiff's exhibits were specifications submitted to plaintiff by companies seeking to purchase the merchandise, *e.g.*, Exh. 14, and sales brochures of suppliers that described products like the concentrated fruits and the production methods used. Exhs. 9, 11, & 20. Plaintiff also introduced purchase orders and sales memoranda from actual sales of concentrated fruit merchandise. Exhs. 10, 15, & 16. Additionally, plaintiff introduced labels and containers from various retail juice products that plaintiff's witnesses testified contain substances identical to the disputed merchandise. Exhs. 20, 21, 22, 25, & 26. In almost all these documents the ingredient corresponding to the concentrated fruits is described as a "concentrate" of some kind — mostly, as either "apricot [or peach or pear] concentrate" or as "puree concentrate."[2] For example, one of the retail juice product labels plaintiff introduced, Gerber apricot juice, listed "apricot juice, from concentrate" as an ingredient. Exh. 13. Plaintiff's witnesses testified that the Gerber concentrate is substantially identical to the apricot product at issue. Tr. 13–14.

Where exhibits did not describe the concentrated fruits as concentrate, plaintiff's witnesses testified that the variant language nevertheless described the imported merchandise. For example, exhibit 22, a label from Hawaiian Punch, contains the phrase "apricot puree". Plaintiff's expert witness, Mr. G.A. Jackson, who worked as a chemist for the company that manufactures Hawaiian Punch, testified that the principal fruit ingredient in the Hawaiian Punch drink was an unconcentrated puree (he defined "puree" as a thick juice) before methods for producing concentrates were developed. When concentrates became available, at the beginning of the 1960s, they were substituted for the puree in Hawaiian Punch, according to the witness. Mr. Jackson stated that the phrase "apricot puree" remained on the label, but the phrase "with seven real fruit juices" was added, and that the apricot concentrate content was included as one of the seven juices. Tr. 249–264.

Mr. Jackson further testified that the terms puree and pulp are not used interchangeably in the fruit juice industry, Tr. 272–274 and that the thirty-two Brix product at issue is a concentrated juice and could not correctly be called a pulp. Tr. 265. He stated that in his experience the only commercial product called "pulp" is the insoluble material removed in the production process to prevent clogging of the processing equipment. Tr. 265, 267–268. He testified that the pulp is "worthless" and must either be disposed of as refuse or used as animal feed. Tr. 267–268. Further, Mr. Jackson stated that all of the juice is gone from this pulp leaving only insoluble material or cellulose fiber. Consequently, he stated, it is impossible to obtain a concentrate or juice beverage from such pulp. Tr. 265–270.

Plaintiff's other witnesses stated that they knew of no commercially available product known as apricot, pear or peach pulp, and that the

---

[2] Witness Jack Hartog stated that plaintiff preferred and normally used the phrases "apricot", "peach", and "pear concentrate", but in a minority of instances conformed to variations used by customers, such as "* * * nectar concentrate" or "* * * puree concentrate". Tr. at 44–45.

pulp removed in processing could be used as animal feed or discarded. *E.g.*, written testimony of Mr. George Welch at p.12. One witness testified that a product known as apricot pulp and consisting of macerated whole fruit was available in the past, but had not been available for many years at the time of trial.

In summary, the plaintiffs witnesses, drawing on their extensive experience in the industry, stated the following: The imported thirty-two Brix fruit products (as well as such products produced domestically) are widely recognized and referred to as "concentrate." The products are concentrated fruit juices and are overwhelmingly used as the principal ingredient in fruit juices and fruit beverages (with a minority use in baby foods). While concentrate sometimes contains varying amounts of pulp, it is not itself pulp, and pulp is not and can not be used to make fruit concentrates, juices, or beverages without processing it first into a puree or juice.

Defendant called two experts at trial, one expert and one fact witness. Defendant's expert witness, Dr. Daniel E. Carroll, Jr. is a professor of food science at North Carolina State University. Dr. Carroll testified that he has had extensive experience in grape juice and wine processing, but little or none involving apricots, or pears. Tr. 368. He has had some experience in peach processing, but none involving peach concentrate. Tr. 368. Dr. Carroll testified that he had examined a sample of the imported merchandise provided to him by defendant, and that on the basis of his "sensory analysis" of the concentrated fruits as well as his familiarity with the relevant technical literature, he believed that after steps three or four of the eight-step production process, the concentrated fruits would be puree, and that after step six they become puree concentrate. Tr. 323–326. According to his testimony, the concentrated fruits are not juices, and juices and purees are mutually exclusive. Tr. 336, 345. He stated that he is uncomfortable with the word "pulp," and that the term "puree" is more precise, but "pulp" has been used to describe the concentrated fruits. Tr. 334. As between "juice" or "pulp", he would "probably side with 'pulp'." Tr. 334. He did not unequivocally state an opinion that the concentrated fruits are pulp, or are generally referred to as such.

Defendant's other witness, Mr. Gary Nichols, worked for the Food and Drug Administration (F.D.A.) after college and later for Goya Foods, Inc. in Puerto Rico and then for American Home Foods. He has since rejoined Goya where for the past seven years he has been its director of research and product development in Miami. Mr. Nichols testified principally with respect to several labels from Goya and other brand products introduced by defendant as exhibits. The Goya labels were from apricot, peach, and pear nectars produced by Goya. Exhs. A1, A4, and A8. Defendant's counsel and Mr. Nichols pointed out that the ingredients in those products were listed on the labels as "pulp". Tr. 434. Mr. Nichols stated that the company used that term on the advice of the F.D.A. and based on his understanding of F.D.A. guidelines, even

though the company would have preferred to use other terminology. Tr. 440-41. Several labels introduced from other brands also contained the ingredient term "pulp", as well as various "juice" ingredients. Tr. 435. Mr. Nichols testified that the concentrated fruits were recognized by the industry as pulps, and that they are not juices. Tr. 438. Nevertheless, Mr. Nichols stated that the thirty-two Brix apricot product could be reconstituted into a juice. Tr. 481.

ANALYSIS

*Common meaning:*

Tariff terms are to be construed in accordance with their common and commercial meanings, which are presumed to be the same. *Nippon Kogaku*, 69 CCPA at 92, 673 F.2d 380, 382 (1982). What constitutes the common meaning of a term is a question of law and courts may consult dictionaries, lexicons, scientific authorities, and other reliable sources of information as an aid to their knowledge. *C.J. Tower & Sons, Inc. v. United States*, 69 CCPA 128, 133, 673 F.2d 1268, 1271 (1982).

The Oxford English Dictionary (2d ed. 1989) defines "juice" principally as, "1.a. The watery or liquid part of vegetables or fruits, which can be expressed or extracted; commonly containing the characteristic flavor and other properties." Similarly, Webster's Third New International Dictionary (1981) defines it as, "1. the extractable fluid contents of plant cells or plant structures."

Oxford defines "pulp" in relevant part as, "1. The fleshy, succulent part of a fruit." Webster's defines it principally as, "1. a moist slightly cohering mass consisting of soft undissolved animal or vegetable matter: as a (1): the soft succulent part of the fruit."

According to these common definitions the two substances appear to be distinct. Juice is characterized as liquid, which may be extracted; pulp as an undissolved fleshy mass. While the pulp of the intact whole fruit is succulent (*i.e.* it contains juice) it is undissolved and hence not a liquid. As in the whole fruit, both pulp and juice may be present in varying proportions in a fruit preparation.

This is consistent with the eight-step manufacturing process. The pitted and macerated whole fruit (as at the end of step two of the process) consists of both pulp and juice, but the fleshy, cohering mass of insoluble solids and juice is appropriately referred to as pulp. As the fruit is forced through successively finer screens, more of the fleshy insoluble solids are removed yielding a progressively more fluid product referred to by all of the witnesses as puree.

The common and commercial descriptions of this preparation substantially coincide: Oxford defines "puree" as, "A kind of broth or soup made of vegetables [or] fruit, boiled to a pulp and passed through a sieve," and Webster's, "1. a paste or thick liquid suspension of a food * * * *usu.* produced by rubbing the cooked food through a sieve." Thus "puree" refers to a preparation which is not intrinsically either juice or pulp, but may contain both in unspecified proportion.

While the particular concentrated puree products at issue contain pulp, they are not themselves pulp in the common sense of the word. In fact, pulp is removed in the production process. The production of puree begins with a pulp of the whole fruit, and extracts the juice along with a certain amount of pulp. Rather than an undissolved cohering mass, the puree prior to concentration (at the end of step four) is a liquid consisting of juice and finely divided pulp in suspension. It does not fall within the common meaning of "pulp." Removing water, heating and packaging the puree increases its viscosity but does not change it into pulp.

Moreover, the evidence sustains the conclusion that the concentrated fruits at issue are "concentrated juices" within the common meaning of that phrase. Unquestionably, the unconcentrated purees are liquids extracted from the fruits containing the characteristic flavors, together with the additional pulpy property of the fruits. The common meaning of "juice" does not require that the juice be clarified; juices may and often do contain pulp. The Court concludes that common meaning of "juices" encompasses the purees at issue immediately prior to concentration and that the concentrates may be reconstituted into juices. The concentrated fruits are thus concentrated juices.

*Commercial meaning:*

Where it is affirmatively established that a tariff term had a meaning in trade or commerce different from the common meaning at the time it was enacted into law, and that the commercial meaning was uniform, definite, and general, such meaning will be adopted unless a contrary intention of Congress is clearly manifested. *Cadwalader v. Zeh*, 151 U.S. 171, 176 (1894); *Florsheim Shoe Company v. United States*, 71 Cust. Ct. 187, 190, C.D. 4495 (1973). Such commercial designation is a question of fact to be established in each case. *Daniel Green Shoe Co. v. United States*, 58 Cust. Ct. 7, 14, C.D. 2868, 262 F. Supp. 375 (1967). The principal source of evidence that a commercial meaning of a term was definite, uniform and general throughout the wholesale trade in the United States is testimony of those persons who actually deal in or are conversant with the wholesale trade in which the merchandise travels and the designation it receives therein. *Florsheim*, 71 Cust. Ct. at 191. Plaintiff has amply established a commercial meaning of the term *concentrate* that encompasses the merchandise at issue. Plaintiff's witnesses have hundreds of years of cumulative experience in the fruit juice industry, several as pioneers in modern production methods. Most also hold advanced degrees in relevant scientific areas. The companies that they have worked with are substantially representative of the U.S. juice industry. Under oath those experts unanimously testified that as used in industry the term fruit or puree "concentrate" describes the merchandise imported by plaintiff and "pulp" does not.

The many commercial documents introduced by plaintiff, from major buyers, sellers and suppliers in the juice industry all pertained to merchandise identical to or commercially interchangeable with plaintiff's

imported merchandise, and regularly refer to the concentrated fruits as "concentrate" of one type or another. Such documentary evidence from daily commerce in the merchandise is especially probative in discerning the commercial usage within the juice industry.

The government's evidence at trial did not establish that the concentrated fruits are definitely, uniformly and generally referred to as pulp in the wholesale trade in the United States. The government's expert witness, Dr. Carroll, testified that he has "trouble" with the word "pulp," because he has seen it used in many different ways. The government's trade witness, Mr. Nichols, stated on cross-examination that he considered Libby's use of the word "concentrate" to describe the concentrated fruits on nectar ingredient labels to be accurate. Tr. 456–57. Mr. Nichol's employer, Goya Foods, purchases most of the apricot and peach concentrate it uses in Latin America, not the United States. Tr. 430. Mr. Nichol's understanding of the use of the term "pulp" was based upon its use by Latin American suppliers, who invoice peach concentrate, for example, as "pulpa de melocoton." Tr. 437–438. Several witnesses testified that the word *"pulpa"* has a meaning in Spanish that might be somewhat different from the related word "pulp" in English. *E.g.*, Tr. 152. In this regard, Mr. Nichols admitted that his contact with the previous and current purchasing managers at Goya has been "minimal", and "certainly, the limited discussions, it's something that's always been called 'pulp' in Puerto Rico." Tr. 455.

The Goya labels which refer principally to "pulp," are unconvincing for additional reasons. It was generally agreed by witnesses for both sides that Goya is not a dominant force in the U.S. juice or nectar market. *E.g.*, Tr. 447. Mr. Nichols admitted as much, and stated that Libby is the predominant force in the U.S., while most other individual members have approximately the same market share as Goya. Tr. 447. Plaintiffs exhibits showed that Libby and other companies listed the concentrated fruits as "concentrate".

Finally, as to defendant's other exhibits, which contain neither the terms "pulp" nor "concentrate", it is most plausible that the term "juice" used on those labels refers to the subject merchandise when reconstituted. Based on the other factors just discussed, as between the two terms, "concentrate" clearly is the more likely and appropriate counterpart to that "juice" ingredient than "pulp".

The definite, uniform and general commercial designation of the concentrated fruits as "concentrate" in the United States' juice industry contrasts sharply with the occasional and inconsistent reference to the concentrated fruits as "pulp." The Court concludes that the concentrated fruits are not commercially designated as "pulp." The commercial designation of the concentrated fruits as "concentrate" is consistent with the Court's earlier conclusion that the products are concentrated fruit juices in the common meaning of the phrase. Plaintiff has rebutted the presumption that the Customs Service classification is correct. The

proper classification of the apricot, pear and peach concentrate is TSUS item 165.55.

*Use vs. eo nomine provisions:*

Even assuming, *arguendo*, that the concentrated fruits are equally amenable to classification as either juice or pulp, general rules of construction applicable to the Tariff Schedules require that it be classified as concentrated juice. It is a long recognized rule of construction for tariff classification that when an article is described in more than one paragraph or item of a tariff act, it is to be classified under the provision which most specifically describes it. *United States v. Simon Saw & Steel Co.*, 51 CCPA 33, 40, C.A.D. 834 (1964); TSUS Interpretive Rule 10(c). Applying this principle, it has been held as a general rule that where one tariff item is an *eo nomine* provision, describing the concentrated fruits by name, and another, equally applicable item describes it by use, the use provision will prevail. *E.g., Pressner & Co. v. United States*, 42 CCPA 48, 49–50 (1954).

Item 165.55, under which plaintiff seeks to have its merchandise classified, clearly is a "use" provision: Schedule 1, Part 12, Headnote 1 provides for classification within that part only of products "fit for use as beverages or for beverage purposes." Uncontroverted evidence establishes that the overwhelming majority of the concentrated fruits are used to prepare beverages. Items 152.42, 152.78, and 152.88, under which defendant classified the merchandise are *eo nomine* provisions covering merely apricot, pear and "other" fruit pulps. Even if these latter three provisions could be said also to encompass the subject merchandise, the item contended for by plaintiff must prevail as a "use" provision.

## CONCLUSION

For the foregoing reasons, the Court finds that the merchandise at issue in this action is more properly classifiable under the TSUS Item 165.55 claimed by plaintiff than those Items under which defendant classified the merchandise. Accordingly, defendant is ordered to reclassify the merchandise in accordance with the terms of this opinion.